Walter J. KOHLER, Plaintiff-Appellant,

v.

KOHLER CO., a corporation, Herbert V. Kohler, Ernst & Ernst, a partnership, and Paul F. Johnson, Defendants-Appellees.

No. 14028.

United States Court of Appeals
Seventh Circuit.

June 26, 1963.

Steven E. Keane, Marvin E. Klitsner, William J. Kiernan, Jr., and Foley, Sammond & Lardner, Milwaukee, Wis., for appellant.

Louis Quarles, Lyman C. Conger and E. J. Hammer, Kohler, Wis., Maxwell H. Herriott, Quarles, Herriott & Clemons, Milwaukee, Wis., for appellees Kohler Co. and Herbert V. Kohler.

Norman C. Skogstad, Paul J. Schierl, Wickham, Borgelt, Skogstad & Powell, Milwaukee, Wis., for appellees Ernst & Ernst and Paul F. Johnson.

Before SCHNACKENBERG, CASTLE, and SWYGERT, Circuit Judges.

SWYGERT, Circuit Judge.

This action was brought by Walter J. Kohler against Kohler Co., a Wisconsin corporation that manufactures

plumbing fixtures and has its principal place of business at Kohler, Wisconsin; Herbert V. Kohler, its president, Ernst & Ernst, a partnership that is engaged in public accounting; and Paul F. Johnson, a partner of that firm.

Plaintiff sought damages arising out of a sale of Kohler Co. common stock which he sold to the company for $115 per share on February 20, 1953. In his complaint plaintiff alleged that he was induced to sell his stock by "misrepresentation, half truths, and omissions" of defendants and as a result sold his stock for at least $10 per share less than its "actual" or "fair market" value. He contended that defendants violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b),[1] and Rule X-10b-5 of the Securities and Exchange Commission, 17 C.F.R. 240.10b-5,[2] in that their conduct constituted a breach of their duties as "fiduciaries" and "insiders" to fully and accurately disclose all facts material to the value of his Kohler Co. stock.

The district judge made findings of fact and wrote an opinion which appear in 208 F.Supp. 808. Plaintiff appeals from the judgment dismissing the action.

In view of the detailed treatment accorded the facts by the district judge, only an abbreviated summary seems necessary.

Plaintiff was a stockholder of Kohler Co. from 1931 to February 20, 1953. He owned 21,415.6139 of the 200,000 shares of common stock outstanding. Also, he was an employee of the company in various capacities from 1925 to 1947, a director from 1936 to 1947, and its secretary from 1937 to 1947.

Herbert V. Kohler is plaintiff's uncle and was at all times pertinent hereto the president and chairman of the board of directors of Kohler Co. The company is a closely held corporation, having had only twenty-six common stockholders to the time plaintiff sold his stock, many of whom were and are related to plaintiff.

On February 2, 1953, plaintiff wrote Herbert V. Kohler that he held an option to buy stock in the Vollrath Company, of which plaintiff was then president, and in order to exercise the option it was necessary that he sell his Kohler stock. Upon receipt of the letter, Herbert V. Kohler consulted with his fellow directors and officers to find out if the company was interested in buying plaintiff's stock. It was decided that Johnson, a partner in the accounting firm of Ernst & Ernst, the firm that handled the Kohler Co. audits, should act as an intermediary and meet with plaintiff to "negotiate" the terms of the sale and find out what price plaintiff had in mind.

1. § 78j(b) "Manipulative and deceptive devices.
 "It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
 * * * * *
 "(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors. * * * *"

2. Section 240.10b-5 "Employment of manipulative and deceptive devices.

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,
 "(a) To employ any device, scheme, or artifice to defraud.
 "(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 "(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." (Emphasis supplied.)

On February 5, Herbert V. Kohler wrote plaintiff that Johnson would contact plaintiff and that "He [Paul F. Johnson] has available the facts which might play a part in a discussion of values." At a meeting on February 13, plaintiff informed Johnson that he had a price of $125 per share in mind and that he wanted an answer to his proposal by February 18. On February 19, Herbert V. Kohler wrote Johnson authorizing him to purchase plaintiff's stock at $115 per share.

In the meantime, on February 16, Johnson mailed plaintiff certain satistical data with the following letter:

"At the time of our discussion last Friday afternoon, it was agreed that I would furnish you with the statistical data that I had used in projecting the possible value of Kohler Co. common stock. These projections are based upon average earnings and other data of Crane Company and American Radiator & Standard Sanitary Mfg. Co. I believe that these schedules are self-explanatory but should any question occur to you, I shall endeavor to answer it."

The data included a series of ten projected values of Kohler Co. stock ranging from $58.83 to $149.38 based upon certain comparative ratios of Crane and American-Standard, Kohler Co. competitors, whose stocks are publicly traded.

Upon receipt of the data, plaintiff ascertained the percentage ratio of market selling price to book value of both Crane's and Standard's stock and took an average of the two. He then applied this average figure to the Kohler Co. book value of $155.60 per share listed in the data. The computation resulted in a figure of $117.48 per share.

On February 20, plaintiff again met Johnson. Plaintiff discussed the figure of $117.48, and commented that in his judgment this calculation would justify a price of $120 per share as well as a price of $115. Johnson agreed that it would. The parties then signed the sales contract at the latter figure, and the shares were transferred.

We hold that the fact determinations by the trial judge are not erroneous and that when the applicable law is applied to these determinations, the district court's decision is correct.

In regard to the legal criteria that should be applied, we look to the statute and consider it in the light of the implemental interpretation given it by Rule X-10b-5, and to prior decisions that have dealt with the statute and the rule. It is clear from such examination that the statute was meant to cover more than deliberately and dishonestly misrepresenting or omitting material facts which ordinarily are badges of fraud and deceit. See Ellis v. Carter, 291 F.2d 270 (9th Cir., 1961); Texas Continental Life Ins. Co. v. Bankers Bond Co., 187 F.Supp. 14 (W.D. Ky.1960).

This court in James Blackstone Memorial Library Ass'n v. Gulf, M. & O. R. Co., 264 F.2d 445, 450 (7th Cir., 1959), after citing a number of decisions, said "These cases furnish support * * for the proposition that majority stockholders * * * occupy a fiduciary relationship toward minority stockholders and, when purchasing their shares are under an obligation to divulge all material facts." In other words, as Judge Grubb in this case pointed out, knowledge of the falsity or misleading character of a statement and a bad faith intent to mislead or misrepresent are not required to prove a violation of the statute upon which a civil remedy for damages will lie.

It is clear that the statute was intended to create a form of fiduciary relationship between so-called corporate "insiders" and "outsiders" with whom they deal in company securities which places upon the insider duties more exacting than mere abstention from what generally is thought to be fraudulent practices. If so, the question arises: What are the limits of those duties? We are satisfied that the answer cannot

be confined to an abstract rule but must be fashioned case by case as particular facts dictate.

Of course general principles, implicit in the statute and the rule and elucidated by decisions, are helpful and may be utilized.

■ We think Judge Leahy in Speed v. Transamerica Corp., 99 F.Supp. 808, 828–829 (D.C.Del.1951), stated the general principles that are applicable in terms upon which we cannot improve:

"It is unlawful for an insider, such as a majority stockholder, to purchase the stock of minority stockholders without disclosing material facts affecting the value of the stock, known to the majority stockholder by virtue of his inside position but not known to the selling minority stockholders, which information would have affected the judgment of the sellers. The duty of disclosure stems from the necessity of preventing a corporate insider from utilizing his position to take unfair advantage of the uninformed minority stockholders. It is an attempt to provide some degree of equalization of bargaining position in order that the minority may exercise an informed judgment in any such transaction. Some courts have called this a fiduciary duty while others state it is a duty imposed by the "special circumstances". One of the primary purposes of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78a et seq., was to outlaw the use of inside information by corporate officers and principal stockholders for their own financial advantage to the detriment of uninformed public security holders."

These underlying principles apply not only to majority stockholders of corporations and corporate insiders, but equally to corporations themselves when acting through their officers, directors or agents.

We now turn to a discussion of the specific items of nondisclosure.

As heretofore noted, the president of Kohler requested Johnson to "negotiate" the stock purchase. Whether plaintiff initiated the discussions because he wanted to exercise his option with Vollrath or to avoid an embarrassing situation developing because of the Kohler company's labor difficulties and his position as Governor of the State of Wisconsin is immaterial except as it bears upon the conclusion that plaintiff was intent on selling his stock in as short a time as possible.

The company asked for a thirty day option—time in which to consider the financial implications of the purchase of plaintiff's stock. The effort was abandoned when it became clear that plaintiff would not agree to it.

It is pertinent to note that even though the stock owned by Walter Kohler constituted more than ten per cent of the outstanding common stock of one of the large plumbingware manufacturers in the country, this sale was accomplished, from the first suggestion made by plaintiff on February 2, 1953, to the consummation of the sale on February 20, 1953, in less than three weeks—an abbreviated period directly attributable to the near-urgent negotiation timetable set by plaintiff.

It was within this limited period that Herbert V. Kohler wrote plaintiff on February 5, that Johnson " * * * has available the facts which might play a part in a discussion of values." The financial data in respect to Kohler Co. which Johnson furnished plaintiff was contained in trial Exhibit 20—a projection of possible values of Kohler common stock based upon average earnings and other data of Crane Company and American Radiator & Standard Sanitary Mfg. Co. These projections are admittedly accurate based on the information contained in Exhibit 20. Earnings and dividends for the three companies for the years 1942 through 1951 were included in the Exhibit.

### THE PENSION PLAN.

Between 1948 and 1951, Kohler Co. paid to the John Hancock Insurance

Company $3,385,127.94 to purchase annuities to fund accrued pension liabilities for persons in its employ as of December 31, 1948, on account of service prior to that date. It is plaintiff's contention that defendants knew but did not by Exhibit 20 or in any other manner inform plaintiff:

(a) That the book value figure given to plaintiff in Exhibit 20 for Kohler Co. was computed as though the retirement annuities purchased by this funding did not exist and had no value;

(b) That the after-tax earnings for Kohler Co. reported to plaintiff in Exhibit 20 had been depressed by an amortization of a portion of this item for each of the years from 1948 through 1951;

(c) That the remaining unamortized portion of this pension funding in the amount of $2,174,416 or $10.87 per share was nowhere reflected in the net worth or book value of Kohler Co. as of December 31, 1951, as set forth in Exhibit 20;

(d) That the data for American Radiator & Standard Sanitary Corporation and for Crane Company submitted in Exhibit 20 was not comparable to that of Kohler Co., in that neither of these companies had funded their comparable past service pension costs, nor had they set them up as liabilities;

(e) That the projected values of Kohler Co. stock based upon American Radiator & Standard Sanitary Corporation and/or Crane Company would be substantially higher if either their book values and/or earnings or those of Kohler Co. had been adjusted or stated on a "pro forma" basis so as to make them comparable with respect to this pension item;

(f) That on the only two previous occasions on which Ernst and Ernst had been requested by Kohler Co. to determine book value for the purpose of ascertaining the price at which the company would purchase shares of its own stock, book value had been computed by including as an asset the unamortized portion of the pension item; [3] or

(g) That as of December 31, 1951, Kohler Co. was not only relieved of the obligation to make any further payments on account of these past service pension rights, but would be entitled to take additional federal income tax deductions over the succeeding 6 to 8 years aggregating $2,174,416 without paying out another dollar with respect thereto.

The trial judge analyzed the evidence regarding the company's accounting treatment of the pension annuity costs and held that, "There has been no showing of abuse of discretion, bad faith, or impropriety in the accounting aspects of these items." Prior to arriving at this conclusion Judge Grubb observed in his opinion:

"Defendant's expert witnesses, Thomas D. Flynn and Ralph S. Johns, both partners in national certified public accounting firms and both eminent in their profession, characterized Kohler Co.'s handling of pension costs as acceptable accounting in view of the unusual features of the pension plan. The aspects of the plan which call for an exceptional treatment include the fact that large cash payments were made, totaling over three million dollars, to purchase these annuities, and the fact that each individual employee covered by the plan had vested contractual rights to receive a pension." (208 F.Supp. p. 819)

He also pointed out that the accounting treatment of the pension costs was fully disclosed in the company's books.

 Since the plaintiff concedes that the financial data shown in Exhibit 20 for

---

3. It appears, however, that similar and subsequent sales were based on a computation of book value in which this item was excluded; and that the company considered the inclusion of the item in the 1949 and 1950 sales a "mistake."

the period covered was not factually inaccurate we think there was no breach of duty in Johnson's failure to volunteer the details of the pension plan or the accounting method of how the annuities funding was treated on the books, even though a different method, if adopted by Kohler, (by inclusion of the unamortized amount in the company's assets) would have increased the book value of the company. We say this particularly in view of the conflict among the accountants themselves who testified as experts.

Plaintiff could hardly argue from the evidence adduced that the company set up its accounting system to mislead stockholders who might want to sell their stock. We think that it was within management's discretion to handle the pension accounting in the manner it deemed best. Having done that without intent to mislead but for sound business reasons, defendants ought not be penalized for failure to explain or justify its accounting procedures voluntarily, absent evidence that the failure to explain was motivated by bad faith. This is not a situation of a questionable manipulation of the company's books in an effort to conceal; rather, it appears to us from the facts found by the trial court and from the record as an "after-the-fact" conclusion by plaintiff that the accounting treatment of the pension costs either should have been different than it was or that it should have been explained or clarified to him—something defendants may not be held to have anticipated under the circumstances.

Moreover, the trial judge pointed out in his opinion "that in 1949 plaintiff attended a stockholders' meeting, at which time the pension plan and the actions taken by the board of directors during the year 1948 were discussed, including the accounting treatment of the pension payments which were approved without dissent." (208 F.Supp. p. 819)

### The 1952 Audit.

Plaintiff contends that the projected "possible" values of his stock as computed by Johnson on Exhibit 20 were misleading in that those computations failed to include the 1952 financial data of Kohler Co. which were then available to Johnson.

In that connection much is made by plaintiff of a worksheet computation made by Johnson, similar to Exhibit 20, which included the 1952 Kohler financial data. This computation, trial Exhibit 61, was made by Johnson during his discussions with plaintiff but was not shown to him.

It is true that Exhibit 61 may have added to the sum of knowledge available to plaintiff by reason of its projected values of Kohler stock based on the addition of 1952 earnings and dividends of the three companies and the elimination of the corresponding 1942 values; however, as found by the trial judge, Johnson, in preparing Exhibit 61, was utilizing accountants' speculation and approximating rules-of-thumb. He had no exact 1952 figures for the two companies, Crane and American-Standard, that he was using for comparative purposes in projecting Kohler's stock values. He had to estimate them and, it is a reasonable inference that, as an accountant, he knew that his worksheet projections were speculative at best. As it turned out he grossly underestimated the actual 1952 earnings of Crane and American-Standard.

While the projected value of Kohler stock arrived at by the faulty comparisons indicated a substantially higher value for the Kohler Co. stock on Johnson's worksheet, later, when true comparison values of Standard and Crane became known, a projected value somewhere between the Exhibit 20 projected values and the Exhibit 61 projected values resulted. Again, this is "after-the-fact" analysis. We do not think that honesty and fair dealing required Johnson to proffer his "guesswork" to plaintiff. Under the circumstances, we think that plaintiff's proof failed to establish any dishonesty or breach of trust or duty on Johnson's part.

## TAX REFUND.

On January 10, 1953, Kohler Co. received an excess profits tax refund covering the years 1941 through 1945, together with interest on the refund. The refund amounting to $488,529.76 was added directly to surplus in the company's 1952 financial statement and the interest amounting to $106,061.95 was included in its 1952 income. The receipt of the tax refund and its accounting treatment was shown on the company books.

Kohler Co.'s earnings for 1951 were $3,650,181.23. Its earnings for 1952, including the interest on the tax refund, were $2,477,498.54, or $1,172,682.69 less than for 1951. Had the tax refund of $488,529.76 also been added to the 1952 earnings, the total for that year was still $684,152.93 less than the earnings for 1951.

Exhibit 20 contained information that did not include data for the year 1952 pertaining to Kohler Co. This is manifestly apparent from the exhibit itself. Furthermore, Johnson did not volunteer any information about Kohler Co. for 1952, although its financial operations including the tax refund were shown on the Kohler Co. books and were available to him at the time of his negotiations with plaintiff.

█ The question is whether Johnson should have volunteered information about the tax refund, as plaintiff contends, although plaintiff did not ask for any information concerning the year 1952.

We think that the tax refund cannot be separated from the 1952 operations of the company as a whole and, when considered in that light, what we said about the 1952 audit and Johnson's projections of Kohler Co. stock values in Exhibit 61 is also pertinent to this question.

Since Johnson was aware that the 1952 earnings were less than the 1951 earnings even when the tax refund together with the interest on it were included in the 1952 earnings, we do not think good faith and honest dealing required him to inform plaintiff, as an isolated fact, that Kohler Co. had received a tax refund plus interest in excess of $500,000 which had been included in its 1952 financial statement.

Moreover, Robert Kohler, a stockholder of Kohler Co. and plaintiff's brother, prior to February 20, 1953, had supplied the latter's broker, Robert W. Baird & Co. with information concerning the estimated full year earnings of Kohler Co. for 1952. This information, transmitted by letter to plaintiff by one E. R. Van Horn of the Baird firm, was to the effect that Kohler Co. earnings for the eleven months ending November 30, 1952, had been $1,568,000 and that its estimated earnings for the full year were $2,500,000. Van Horn specifically called attention to the "quite substantial" difference between the reported earnings for eleven months of 1952 and the estimated earnings for the full year.

We think it significant to note that plaintiff with this available information might have been led to investigate the variation between the eleven-month reported earnings and those estimated for the full year. By so doing he would have discovered the tax refund plus interest. Mere inquiry, if plaintiff was troubled with the information, would have disclosed the financial details of the 1952 audit including the tax refund. We believe that the bad faith construction placed on defendants' failure to volunteer this information is again only an "after-the-fact" conclusion of plaintiff, not justified by the totality of facts found in the record before us.

█ In appraising plaintiff's contentions, we think the duty of disclosure of material facts placed upon corporate insiders such as defendants by Section 78j(b) and Rule X-10b-5 is necessarily limited to an exercise of fair and honest business practices under all the circumstances existing at the time of the transaction.

█ Furthermore, honesty and fairness permit consideration of the actual

and normal business acumen of the seller. Here, the company could fairly deal with a person who had had many years of intimate acquaintance with the affairs of the corporation, who was closely related to many principals of the corporation, who had extrinsic sources of sound business advice, and who himself was promoting a speedy sale, in a manner that might not be fair if plaintiff had been a novice to stock transactions or the corporation's activities.

On one hand, corporate insiders must scrupulously disclose to outsiders those material facts about a corporation's business which in reasonable and objective contemplation might affect the value of the corporation's stock or securities and which the insiders should reasonably believe are unknown to the outsider. On the other hand, they are not required to search out details that presumably would not influence the person's judgment with whom they are dealing.

 State court decisions involving fraud and misrepresentation are applicable only indirectly as supplementary aids in establishing standards of diligence. Congress has established its own standard which is to be measured by federal law interpreting the statute and the rule unhindered by restrictive applications of state common law. The need for uniform rules regulating transactions governed by federal law makes necessary such a holding. See McClure v. Borne Chemical Co., 292 F.2d 824, 834 (3rd Cir. 1961); also, Comment, The Prospects for Rule X-10B-5: An Emerging Remedy for Defrauded Investors, 59 Yale L.J. 1120 (1950).

 The statute and the rule basically call for fair play and abstention on the part of the corporate insider from taking unfair advantage of the uninformed outsider or minority stockholder. Such a standard requires the insider to exercise reasonable and due diligence not only in ascertaining what is material as of the time of the transaction but in disclosing fully those material facts about which the outsider is presumably

uninformed and which would, in reasonable anticipation, affect his judgment.

When the totality of facts and circumstances indicates that such diligence has been observed, as we think it does in the instant case, the requirements of the statute and the rule have been satisfied.

The judgment is affirmed.