401 F.2d 47
 JORDAN BUILDING CORPORATION, an Iowa corporation, Kilborn
Photo Paper Company, an Iowa corporation, and
Clifford H. Jordan, Plaintiffs-Appellants,
v.
DOYLE, O'CONNOR & CO., Inc., an Illinois corporation et al.,
Defendants-Appellees.
 No. 16543.
 United States Court of Appeals Seventh Circuit.
 Aug. 14, 1968.
 
 Arnold I. Shure, Donald S. Manion, Robert A. Sprecher, Chicago, Ill., for appellants.
 Sheldon A. Zabel, Schiff, Hardin, White, Dorschel & Britton, Bell, Boyd, Lloyd, Haddad & Burns, Milton H. Cohen, Mitchell S. Rieger, William A. Montgomery, Charles T. Martin, Jack M. Whitney, Charles A. Tausche, Rudy L. Ruggles, James E. Hastings, Richard E. Wiley, Robert L. Slater, Joseph O. Kostner, Jerome Goldberg, for appellees.
 Philip A. Loomis, Jr., David Ferber, Janet G. Gamer, Washington, D.C., Richard M. Phillips, Asst. General Counsel (Securities and Exchange Commission), Jr., amici curiae.
 Before CASTLE, Chief Judge, and SCHNACKENBERG and KERNER, Circuit judges.
 SCHNACKENBERG, Circuit Judge.
 
 
 1
 Pursuant to 28 U.S.C. 1292(b), Jordan Building Corporation, an Iowa corporation, Kilborn Photo Paper Company, an Iowa corporation, and Clifford H. Jordan, plaintiffs, were granted leave to appeal from an interlocutory order of the district court entered July 18, 1967, based upon its dismissal of count I of plaintiff's complaint, as amended, wherein they asserted a claim for damages as defrauded purchasers of securities under 27 of the Securities and Exchange Act of 1934 (15 U.S.C. 78aa), and 10(b) of that act (15 U.S.C. 78j(b)) and rule 10b-5 promulgated thereunder by the Securities and Exchange Commission (17 C.F.R. 240.10b-5).
 
 
 2
 Impliedly for the reasons assigned by the district court, it held that a defrauded purchaser of securities has no private civil remedy under 10(b) of the 1934 Act and rule 10b-5.
 
 
 3
 Inasmuch as the court frankly acknowledged (282 F.Supp. 87) that his position is contrary to the rulings of seven federal courts of appeals, he made the certificate required for an interlocutory appeal to this court.
 
 
 4
 Defendants, Doyle, O'Connor & Co., Inc., an Illinois corporation, and Bacon, Whipple & Co., a partnership, are stock brokers. Also joined as defendants, individually, are: Leo J. Doyle, Sr., J. Robert Doyle and John Croghan, officers and employees of Doyle, O'Connor & Co., Inc., and William T. Bacon, Jay N. Whipple, Bryan S. Reid, Jr., Ernest F. Hartshorne, Robert B. Krell, Gordon Bent, William T. Bacon, Jr., Leslie Wagner, Andrew D. Buchan, James T. Brophy, John D. Ames, Francis R. Schanck, Jr., Harold H. Sherburne, and Willis H. Littell, partners of Bacon, Whipple & Co.; and Otto Clark, the former president of International Photocopy Corp. (IPC), an Illinois corporation.
 
 
 5
 1. Plaintiffs have charged, inter alia, that they were induced to purchase debentures issued by IPC through a series of false statements and omissions of material facts.[1]
 
 
 6
 It appears from the allegations of count I, which for the purpose of the district court's ruling on the motion to dismiss must be taken as true, that on October 31, 1962 plaintiffs were by defendants fraudulently induced to purchase $300,000 of convertible debentures of IPC and that plaintiffs made said purchases in reliance on defendants' materially false representations made orally, by written prospectus, and in other documents delivered by defendants to plaintiffs. The subject matter of these representations, as fully set forth in count I, concerned the financial condition of IPC, its products, its manufacturing know-how, its production and sales of certain new products, prices in the over-the-counter market for its common shares of stock into which the debentures were convertible, the prospects of the company in the photocopying machine manufacturing field, and the prospects of an advancing market price for its common stock.
 
 
 7
 It is further alleged in count I that defendants failed to disclose to plaintiffs many other facts which had a material bearing on the situation of the company, the issuance of the securities and the truth of representations made, the disclosure of which was required by 10(b) of the 1934 Act and rule 10b-5 thereunder.[2]
 
 
 8
 Plaintiffs also were falsely advised by the underwriters on October 31, 1962, that $700,000 of debentures had already been sold and that, if plaintiffs purchased $300,000 of the issue, the needs of IPC for cash would be satisfied, except for bank credit.
 
 
 9
 The underwriters falsely represented to plaintiffs that IPC was a solid company with excellent production and sales results, that they had studied and knew the company and that it was a good deal. This was said either with knowledge of the untruth of the representations or recklessly without reasonable and adequate investigation of facts available to defendants.
 
 
 10
 The underwriters were principals with IPC in a joint venture to sell the debenture issue. They had directly or indirectly loaned IPC $500,000 on August 23, 1962, with the understanding that this amount would be repaid out of the first proceeds of the issue. They thus had a substantial (about 50%) interest in the proceeds of the sale. Further, they had guaranteed to place or sell at least $550,000 of the issue.
 
 
 11
 In Dasho v. Susquehanna Corporation, 7 Cir., 380 F.2d 262 (1967), cert. denied Bard v. Dasho, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 470, we recognized the validity of a cause of action based on rule 10b-5 brought by one of Susquehanna's shareholders. See also Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967), where the court said:
 
 
 12
 '* * * In addition, we are guided by the familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes. The Securities Exchange Act quite clearly falls into the category of remedial legislation. One of its central purposes is to protect investors through the requirement of full disclosure by issuers of securities, and the definition of security in 3(a)(10) necessarily determines the classes of investments and investors which will receive the Act's protections. Finally, we are reminded that, in searching for the meaning and scope of the word 'security' in the Act, form should be disregarded for substance and the emphasis should be on the economic reality.'
 
 
 13
 To the same effect is J. I. Case Co. v. Borak, 377 U.S. 426, 432, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964), where the court said:
 
 
 14
 '* * * While this language makes no specific reference to a private right of action, among its chief purposes is 'the protection of investors,' which certainly implies the availability of judicial relief where necessary to achieve the results.'
 
 
 15
 and at 433, 84 S.Ct. at 1560, the court added:
 
 
 16
 'We, therefore, believe that under the circumstances here it is the duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose. It is for the federal courts 'to adjust their remedies so as to grant the necessary relief' where federally secured rights are invaded. * * *'
 
 
 17
 The Doyle, O'Connor brief contends that the Securities Act of 1933 and the Securities Exchange Act of 1934 are in pari materia and should be read together as a part of a single legislative design, and that there should be no implied remedy under rule 10b-5 for conduct within an express liability provision of the 1933 or 1934 acts. As plaintiffs point out, however, the complaint herein charges defendants as principals and joint venturers and is replete with facts which charge fraud. In Ellis v. Carter, 9 Cir., 291 F.2d (1961) it was held, at 274:
 
 
 18
 '* * * Section 10(b) speaks in terms of the use of 'any manipulative device or contrivance' in contravention of rules and regulations as might be prescribed by the Commission. It would have been difficult to frame the authority to prescribe regulations in broader terms. Had Congress intended to limit this authority to regulations proscribing common-law fraud, it would probably have said so. We see no reason to go beyond the plain meaning of the word 'any', indicating that the use of manipulative or deceptive devices or contrivances of whatever kind may be forbidden, to construe the statute as if it read 'any fraudulent' devices.'
 
 
 19
 It is apparent that our views expressed in Borak v. J. I. Case Co., 7 Cir., 317 F.2d 838 (1963) (affirmed 377 U.S. 426, 84 S.Ct. 1555, 15 L.Ed.2d 423), were not inconsistent with the conclusion reached in Ellis. Moreover, in Kohler v. Kohler Co., 7 Cir., 319 F.2d 634, 7 A.L.R.2d 486 (1963), we evidenced our adherence to the conclusions reached in Ellis.
 
 
 20
 We agree with plaintiffs' counsel that the holdings in Kohler and Ellis show that a private right of action exists under 10(b) whether the plaintiff is a buyer or a seller.
 
 
 21
 2. The argument by defendants Bacon-Whipple, however, is that plaintiffs' exclusive remedy here is to be found in 15(c)(1) of the 1934 act as amended in 1936, and that the 1936 amendment controls. They cite the legislative history of 15(c)(1) and the Commission's adoption of Rule 15c1-2, effective October 1, 1937, which, inter alia, according to defendants' counsel, defines 15(c)(1) to include (a) 'any act, practive, or course of business which operates or would operate as a fraud or deceit upon any person' and (b) 'any untrue statement of a material fact and any omission to state a material fact * * * which statement or omission is made with knowledge or reasonable grounds to believe that it is untrue or misleading.' Thus the Bacon-Whipple contention is that a scienter was required as governing the conduct of brokers and dealers. From this premise Bacon-Whipple's counsel argue that rule 10b-5, issued May 21, 1942, was aimed at fraud practiced by purchasers where the seller was the victim, not fraud practiced by sellers where the purchaser was the victim, and that the Commission acknowledged that the previously existing rules against fraud in the purchase of securities applied only to brokers and dealers.
 
 
 22
 They state that plaintiffs would have us give to the present action the effect of a repeal of 15(c)(1) and 29(b) and would nullify rules 15c1-2 and 10b-3. To this argument plaintiffs respond that they do not suggest that anything has been or should be repealed by implication any more than any valid section should be repealed by simply ignoring it.
 
 
 23
 Both parties herein rely on Hecht v. Harris, Upham & Co., 283 F.Supp. 417, N.Dist.Calif. (1968), the reasoning of which we find convincing when applied to the case at bar. There plaintiff in her action sued her brokerage firm and its manager for violations of 17(a) of the Securities Act of 1933, 10(b) of the Act of 1934, and rule 10b-5 of the Securities Exchange Commission.
 
 
 24
 The court in its opinion cited 10(b) of the act and rule 10b-5. It held, at 423, that a private civil action for damages lies for violation of the Securities Acts. In the course of its opinion, the court said, inter alia at 441-442:
 
 
 25
 'It will be observed, therefore, that the limitations contained in Section 29 would be applicable only (1) to excessive transactions in the 'over-the-counter' markets, (2) to transactions in which the broker or his agent is vested with a 'discretionary power', and (3) to actions in reliance upon Section 29 (15 U.S.C. 78cc) to declare contracts void for violation of a rule prescribed by Section 15(c)(1).
 
 
 26
 'The pending action is not brought in reliance upon Section 29 of the Act nor is plaintiff's claim based on Section 15(c)(1) of the act nor Rule 15c1-7 promulgated thereunder. It is brought upon the implied right to bring a private civil action for damages for violation of Section 10(b) of the Securities Exchange Act (15 U.S.C. 78j(b)) and on SEC Rule 10b-5 (17 C.F.R. 240.10b-5) promulgated thereunder.
 
 
 27
 'We hold therefore, that the statute of limitations applicable to the churning in this case is, not Section 29(b) of the Securities Exchange Act, but rather Cal.C.C.P. 338(4). * * *'
 
 
 28
 The relevancy of this holding is that in the case at bar plaintiffs rely on 10(b) and rule 10b-5 to seek damages and not to declare any contract void. See generally, 3 Loss, Securities Regulation (2nd ed. 1961), pages 1428-1429.
 
 
 29
 3. Speaking of the case at bar, counsel for Clark maintains that plaintiffs have no implied remedy under 10(b) of the 1934 act or rule 10b-5, as held in Ellis, supra. He asserts it is enough to recognize that this is a case where the conduct alleged in count I is within the purview of 12(1) and 12(2) of the 1933 act; and that 'the attempt to lay the count under 10(b) of the 1934 act is an unwarranted effort to cure plaintiffs' failure to comply with the limitations of these specific sections,' and that 'if these limitations can be ignored, it is fair to assume that ingenious plaintiffs, aided by the Commission, will eventually succeed in using Rule 10b-5 to effectively rewrite the securities laws, without recourse to Congress; this should not be encouraged.' Notwithstanding, counsel asserts that the 1933 and 1934 acts are a comprehensive scheme of regulation, which should be consistently interpreted and when so considered they provide a complete and clearly articulated framework of, inter alia, private civil remedies.
 
 
 30
 With the result which counsel reaches, we have no dispute. We state that the correct result in this case is reached by a direct approach, interpreting the rights of parties herein by a reasonable construction of the relevant provisions of the 1934 act, in the light of the rules applicable thereto. In order that our action may be in accord with the congressional intent found in both the 1933 and 1934 acts, and so that we may give proper recognition to the fact that the remedies supplied by and under these acts are cumulative and not mutually exclusive, for the reasons hereinabove set forth, we now reverse the interlocutory order of the district court from which this appeal was taken.
 
 
 31
 Order reversed.
 
 
 
 [1]
 It is charged that there was no disclosure of the following alleged facts:
 That IPC was insolvent or about to become insolvent; that IPC was a commercial failure; that the proceeds from the offering of debentures were to be used to pay off emergency loans to IPC made by Doyle, O'Connor & Co.; that the offering had not been successful; that all the debentures were not of the same class having the same rights and privileges; that Arthur Andersen & Co., after making a limited review of IPC's accounts had questioned the credibility of the June, 1962, financial statements and expressed the opinion that the financial position of IPC had suffered 'material adverse change between June and October, 1962'; and that quotations for IPC common stock (into which the debentures could be converted) were the result of Clark's successful efforts to rig the market by distributing a false annual report for 1961, disseminating false and fraudulent news stories about IPC's business position, and publishing false and misleading advertisements for IPC's products in various newspapers and magazines.
 
 
 [2]
 Such nondisclosures included the following:
 When the debentures were sold to plaintiffs, IPC's liabilities exceeded its assets by about $330,000. The credibility of the book value of its accounts receivable and inventories had been questioned by independent accountants. This was due, inter alia, to failure to write off defective, non-merchantable products; inventorying of parts known to be defective and their use in manufacture; carrying returns and trade-ins at cost, instead of at substantially lower market values; carrying as legitimate receivables sales of merchandise known to be defective and certain to be returned; failing to offset accounts receivable with credit balances due to customers. The losses from operations in the current and preceding year were grossly understated.