**Stuart A. JACKSON, Plaintiff,**

v.

**Jack OPPENHEIM, Defendant.**

**No. 71 Civ. 1205 (CHT).**

United States District Court,
S. D. New York.

Nov. 21, 1974.

Leonard R. Glass, Glass, Greenberg & Irwin, New York City, for plaintiff.

Peter Fleming, Jr., Douglas K. Mansfield, Curtis, Mallet-Prevost, Colt & Mosle, New York City, for defendant.

OPINION

TENNEY, District Judge.

Plaintiff Stuart A. Jackson ("Jackson") brings this action against defendant Jack Oppenheim ("Oppenheim") pursuant to Section 22 of the Securities Act of 1933, 15 U.S.C. § 77v, Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa and the rules and regula-

tions issued thereunder, and pursuant to the pendent jurisdiction of this Court.[1]

In the first count of the complaint plaintiff alleges that defendant, in violation of Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q, Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b–5 promulgated thereunder, "for his own advantage and personal benefit, willfully failed to disclose the deteriorating financial condition of Chelsea House [Chelsea House Educational Communications, Inc.] to plaintiff and others prior to the sale of his Chelsea House stock to them." (Complaint, ¶ 14). In the second count plaintiff alleges that defendant, in violation of Section 12 of the Securities Act of 1933, 15 U.S.C. § 77l and the rules and regulations promulgated thereunder, "offered to and did sell his Chelsea House stock to plaintiff and others, by the use of means or instruments of transportation or communication in interstate commerce · and the mails, by means of certain oral communications that omitted to state material facts about the fast declining financial situation at Chelsea House which were necessary in order to make the statements, made by defendant, in light of the circumstances under which they were made, not misleading." (Complaint, ¶ 20).

Defendant interposes two affirmative defenses and three counterclaims. These will be discussed in detail after a presentation of the facts.

### Facts

Chelsea House Educational Communications, Inc., a New York corporation, was organized on November 3, 1966, for the purpose of engaging in the publication and distribution of books and other audio-visual materials.

Defendant Oppenheim was a vice president and director of Chelsea House and was one of its major shareholders. Defendant became increasingly critical of the management of Chelsea House, espe-cially its president, Harold Steinberg, during the early months of 1970. He evidenced his dissatisfaction and proffered several suggestions in the form of a memorandum, prepared in March 1970, and distributed to several members of Chelsea's Board of Directors and to several officers. No action was taken as a result of this memorandum and, presumably, as a result of his frustration, defendant resigned as vice president on March 6, 1970. He subsequently resigned as a director on April 10, 1970.

Plaintiff Jackson, an attorney and a partner in the law firm of Royall, Koegel & Wells (now Rogers & Wells), was at all times material an officer and director of Chelsea House.

On April 7, 1970, defendant agreed to convey to plaintiff and others his shares of common stock in Chelsea House. Specifically, plaintiff agreed to purchase from defendant 14,618 shares at $3.00 per share. The terms of the sale called for an initial cash payment of $10,002.00 to be made at the closing on April 10, 1970, and also called for the delivery at the closing of two promissory notes, each in the amount of $16,926.00, to become due on April 10, 1971 and April 10, 1972, respectively. Defendant was to deliver 3,334 shares of stock to plaintiff at the closing with the balance of the shares to be held in escrow to secure payment of the notes. The closing took place as scheduled.

On July 2, 1970, Chelsea House filed a petition pursuant to Chapter XI of the Bankruptcy Act, 11 U.S.C. § 701 et seq., in the United States District Court for the Southern District of New York. The instant action followed and was tried to the Court.

### Plaintiff's Allegations

It is plaintiff's contention that defendant, as an officer and director of Chelsea House, was active in the day-to-day business of that company, and that by reason of this activity defendant had knowledge of certain alleged problems at Chel-

1. Jurisdiction has been held valid by Judge Cooper. 71 Civ. 1205 (April 16, 1971) at 4.

sea House. These problems included financial difficulty and mismanagement. In plaintiff's view, these difficulties were stated in explicit detail in defendant's March 1970 memorandum of which he (plaintiff) was not possessed. In addition, plaintiff states that as an "outside director" he did not participate in the daily operation of Chelsea House and, consequently, had no knowledge of the financial condition of the company prior to or at the time of his purchase of defendant's stock, and further, that defendant knew that plaintiff was not in possession of this information. Plaintiff maintains that this information was intended to be available for the corporate purpose of Chelsea House and not for the personal benefit of defendant.

It is alleged that once defendant knew that plaintiff was a potential purchaser of the stock, defendant had a duty to disclose any material facts within his knowledge prior to the sale, but that defendant willfully failed to make these disclosures. Specifically, plaintiff alleges that defendant failed to deliver the March 1970 memorandum and that had he (plaintiff) possessed this information, he would not have purchased the stock. It was only in July of 1970, plaintiff states, that he learned of the true financial condition of Chelsea House.

Plaintiff concludes that the failure of defendant to disclose the material facts concerning the financial condition of Chelsea House constituted a willful omission which, in light of the circumstances, operated as a fraud and deceit upon the plaintiff in violation of the various sections of the 1933 and 1934 Acts cited *supra.*

Plaintiff recites a payment by his agent in the amount of $10,002.00 to defendant on April 10, 1970, as well as delivery of the promissory notes, and also, receipt by his agent of the 3,334 shares of stock called for in the April 7 agreement.

Plaintiff seeks: (1) a rescission of the agreement dated April 7, 1970 between defendant and himself for the purchase and sale of the shares in question, (2) a return of all monies previously paid to defendant, and (3) a cancellation and rescission of the two promissory notes given by plaintiff to defendant in consideration of the sale.

### Defendant's Allegations

On March 13, 1970, defendant was in the offices of the Royall, Koegel firm and visited plaintiff in his office. This was an unscheduled meeting which lasted approximately 15 to 30 minutes. Defendant contends that during this meeting he gave plaintiff his general opinion about many of the problems then existing at Chelsea House. The thrust of defendant's discussion went to the problems in upper-level management which defendant perceived at Chelsea House, particularly with its president, Harold Steinberg. Defendant stated that in his view Steinberg had to be replaced since the company was unable to secure financing under Steinberg's leadership. In defendant's opinion this difficulty was the direct result of Steinberg's presence and the lack of confidence of many members of the financial community in Steinberg. It was defendant's alleged purpose to secure plaintiff's aid in bringing about the needed change in leadership.

Following the March 13, 1970 meeting defendant then wrote the March memorandum in a last attempt to persuade others on the management team of the need for change at Chelsea House. The March memorandum was, according to defendant, a restatement and an amplification of the subject matter discussed at the March 13th meeting. It contained much criticism, some suggestions for improvement, and a request that a meeting of the Board of Directors be called for April 5, 1970 to discuss the various proposals. The memorandum was given to Leon Friedman, an officer of Chelsea House, with the request that it be distributed. Defendant believes that the memorandum was seen and/or read by several officers and board members.

Defendant next states that sometime during the end of March 1970 he was

approached by William Poten, an employee of Chelsea House, who represented to defendant that a management group was interested in the purchase of defendant's shares of common stock. Defendant agreed to sell at $3.00 per share. The initial group of purchasers grew from three persons to eleven by the date of the closing on April 10.[2]

Defendant alleges that plaintiff had access to all of the pertinent information, including the information contained in the March memorandum, relevant to the purchase of shares. Defendant argues that plaintiff was an officer and director of the company, served as general counsel to Chelsea House, had access to all financial statements, and had supervised the preparation of the registration statement. Defendant maintains that plaintiff had a duty to act as a reasonable investor and to investigate all facts available to him which were relevant to the transaction, and that plaintiff failed in this duty. Defendant suggests that plaintiff knew or should have known all of the facts relevant to the transaction through the exercise of due diligence and that plaintiff's alleged failure to exercise due diligence should now bar his claim. Defendant argues further that he had no intent to defraud or to conceal any relevant facts, and that all of his actions constituted a good faith effort to disclose that knowledge which he possessed regarding the condition of Chelsea House.

Defendant puts forth two additional contentions. First, he maintains that plaintiff was charged with the knowledge, both actual and imputed, of the purchasing group, its agents, and representatives and that these agents knew or should have known the allegedly material facts in controversy.[3] Second, defendant argues that plaintiff purchased the stock, *inter alia,* under advice, unknown to defendant, that the common stock of Chelsea House would be made the subject of a public offering at $7.00 per share, and that as such plaintiff occupied the status of a tippee.[4] This reason, defendant charges, should further preclude a recovery.

Defendant interposes three counterclaims. In the first counterclaim defendant charges that plaintiff repudiated the April 7, 1970 stock purchase agreement and that as a result of that repudiation there is now due and owing the balance of $33,852.00 plus interest at the rate of 9½% per annum. Defendant pleads his due performance. In the second counterclaim defendant argues that the terms of the stock purchase agreement provide that plaintiff will pay all costs of collection including, but not limited to, counsel fees which are incurred by defendant. Defendant claims that the defense of the instant action is essential to his collection effort. Alternatively, he contends that the provisions of Section 11(e) of the Securities Act of 1933, 15 U.S.C. § 77k(e), entitle him to reimbursement for costs incurred in the defense of this action. The final counterclaim seeks to enforce a provision in the promissory notes given by plaintiff to defendant whereby, if a default by plaintiff is not cured within ten days following notice of the default, "all installments shall become due and payable." Additionally, defendant asserts the provisions in each note calling for payment of collection costs by plaintiff in the event that it becomes necessary to place the notes with an attorney for collection. Upon this counterclaim defendant seeks $33,852.00 plus interest at 9½% per annum plus all costs of collection including, but not limited to, counsel fees.

---

2. *See* Plaintiff's Exhibit 4 for the final list of purchasers.

3. Since the conclusion of this Court is that plaintiff either possessed or had access to all of the material information in question, it will be unnecessary to examine this question.

4. It will be unnecessary to reach this question based on the finding of the Court for defendant.

*Count One*

In count one of the complaint plaintiff alleges violations of Section 17(a) of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder. The requirements for a private cause of action under Section 17(a) are the same as the requirements under Rule 10b–5 for the purposes of this case. *Lanza v. Drexel & Co.,* 479 F.2d 1277, 1280 n. 2 (2d Cir. 1973) (en banc). These Sections are essentially the same, except that Section 10(b) and Rule 10b–5 are broader in that they apply to the purchase as well as the sale of securities. *Securities and Exchange Comm'n v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 884 (2d Cir. 1968) (Moore, J., dissenting), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969) *and* 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971), *citing Ellis v. Carter,* 291 F.2d 270, 272–74 (9th Cir. 1961).

The intent of Congress in passing these Sections was to provide equal access to material information. *Securities and Exchange Comm'n v. Texas Gulf Sulphur Co., supra,* 401 F.2d at 849. The anti-fraud provisions are intended to prevent "the inherent unfairness involved where a party takes advantage of such information [information intended to be available only for a corporate purpose] knowing it is unavailable to those with whom he is dealing." *Cady, Roberts & Co.,* 40 S.E.C. 907, 912 (1961). Thus, the law imposes a duty either to disclose the material information prior to the stock transaction or to refrain from the transaction altogether. *Securities and Exchange Comm'n v. Texas Gulf Sulphur Co., supra,* 401 F.2d at 848. The duty to disclose can be breached either by an affirmative misrepresentation or by a nondisclosure. *List v. Fashion Park, Inc.,* 340 F.2d 457 (2d Cir.), *cert. denied,* 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965).

The elements to be proven in an action under either Section 17(a) or Section 10(b) and Rule 10b–5 are scienter, materiality, reliance, and due care.

*Scienter*

Scienter signifies knowledge, *i. e.,* defendant's cognitive state regarding the facts which it was his duty to disclose. The level to which this cognitive element rises can vary from mere negligence with regard to the nondisclosure to an outright intent to defraud. The Circuit Courts of Appeals have been split on the placement of this standard along this spectrum. Several courts have accepted a negligence standard. *See e. g., City National Bank v. Vanderboom,* 422 F.2d 221 (8th Cir.), *cert. denied,* 399 U.S. 905, 90 S.Ct. 2196, 26 L.Ed.2d 560 (1970), *and Ellis v. Carter, supra,* 291 F.2d 270. Controlling on the issue in the Second Circuit is *Lanza v. Drexel & Co., supra,* 479 F.2d 1277. Judge Moore, writing for the majority, stated:

> "We recognize, of course, that other circuits have expressed approval of a 'negligence' standard. (citation omitted). But we do not find these statements persuasive. In addition to the inappropriateness of a negligence standard . . . we believe the actual language of Section 10(b) bars adoption of a negligence standard. . . ." *Lanza v. Drexel & Co., supra,* 479 F.2d at 1305.

The Court of Appeals then concluded that "proof of a willful or reckless disregard for the truth is necessary to establish liability under Rule 10b–5." *Lanza v. Drexel & Co., supra,* 479 F.2d at 1306. Plaintiff clearly has the burden of proving scienter, *i. e.,* defendant's willful or reckless disregard for the truth. *Gould v. Tricon,* 272 F.Supp. 385 (S.D.N.Y. 1967).

Plaintiff makes no allegation that defendant made untrue statements. Rather, plaintiff alleges an omission to state material facts, namely, that defendant failed to provide him with a copy of the March 1970 memorandum, and further, that defendant did not know whether plaintiff had received a copy from anoth-

er source. This failure, plaintiff maintains, amounts to a willful and reckless disregard of the fact that plaintiff was not privy to this information. Plaintiff further alleges that this information could not be obtained from other sources.

Defendant maintains that he had no intent to defraud plaintiff or any of the purchasers of his stock. To the contrary, he contends that he made a good faith effort to disclose all material facts to plaintiff.

■ Plaintiff has failed to carry his burden of proof with regard to the scienter element. This Court is not convinced, based on the evidence presented, that defendant acted in a manner which exhibited a willful or reckless disregard for the truth. Rather, the Court is inclined toward the view that defendant made a good faith effort to convince anyone who would listen, that Chelsea House was in a state of crisis. The problem, precisely, was that no one would listen—they generally considered defendant to be a gadfly, a complainer, and something of a nuisance.

Defendant's relations with plaintiff were not particularly cordial. In spite of this, defendant went to plaintiff's office on March 13, 1970 to complain about the management of Chelsea House and the inability of Chelsea House to acquire financing as a result of the alleged mismanagement.[5] Defendant then expanded on this subject matter in the March 1970 memorandum. He made a reasonable attempt to distribute the memorandum. More importantly, perhaps, there is no evidence that he made any attempt to limit distribution of the memorandum or to limit access to any part of it. Defendant had made his views known time and again. There is simply no evidence of his bad faith.

This Court is not called upon to evaluate defendant's behavior against the lower "negligence" standard, and expressly declines to consider the question.

*Materiality*

■ The fact allegedly misrepresented or omitted must have been material, *i. e.,* a fact to which " 'a reasonable man would attach importance . . . in determining his choice of action in the transaction in question.' " *List v. Fashion Park, Inc., supra,* 340 F.2d at 462, *citing* Restatement, Torts 538(2)(a). Materiality has also been held to encompass those "facts about a corporation's business which in reasonable and objective contemplation might affect the value of the corporation's stock or securities. . . . " *Kohler . v. Kohler,* 319 F.2d 634, 642 (7th Cir. 1963). Conversely, a defendant is "not required to search out details that presumably would not influence the person's judgment with whom [he is] dealing." *Kohler v. Kohler, supra,* 319 F.2d at 642. Nor is he "obligated to confer upon outside investors the benefit of his superior financial or other expert analysis by disclosing his educated guesses or predictions." *Securities and Exchange Comm'n v. Texas Gulf Sulphur Co., supra,* 401 F.2d at 848. There is no obligation to render an "economic forecast". *Arber v. Essex Wire Corporation,* 490 F.2d 414, 421 (6th Cir. 1974).

■ Plaintiff details several allegedly material facts contained in the March 1970 memorandum which he contends were never disclosed. These are as follows:

"1) When the 'Buck Rogers' book was planned, no one realized that it could not make a profit until it sold 25,000 copies. This fact was only discovered *after* the book was published and in the book stores.

"2) The publicity department at Chelsea House ran costly ads in the newspapers when the books which were the subject of those ads were not in the stores.

"3) Books were added to the Chelsea House book list that no one had seen, let alone read, and without

---

5. Apparently plaintiff did not concur as he chose to characterize the situation as a mere

"personality conflict" between defendant and Steinberg, and took no further action.

any preliminary production and editorial costing.

"4) Management produced films without scripts, without school curricular orientation and largely without purchasers.

"5) Bill Poten, the national sales manager of History Machine, the Company's most important asset, was totally inexperienced and without the educational background to handle that job and Andrew Norman, the Controller of the Company, also had no prior experience in fiscal matters as demonstrated by his inability to approximate year-end earnings two months after the 1969 fiscal year ended.

"6) With regard to the Company's financial situation, the Company was near the end of its credit with Random House and the banks, and the Company was forced to spend an inordinate amount of time deflecting various of its creditors.

"7) The Company was in a state of emergency with its current liabilities exceeding its current assets by $500,000 and bankruptcy was imminent." (Plaintiff's Post-Trial Memorandum of Law at 10–11).

Virtually all of this information is material in nature when viewed together. While no one piece of information was *per se* critical, each being no more than a mere detail, the total was of a quality that would guide a potential purchaser's approach to a transaction.

■ Certain of these statements are not material, however. For example, defendant's conclusions that certain of his fellow employees were incompetent was his opinion and was neither fact nor material. Also, defendant's assertion that bankruptcy was imminent was nothing more than the educated guess or prediction of a layman. In fact, all around him heartily disagreed.

*Reliance*

■ Proof of reliance as an element in a 10b–5 case, and the placement of the burden of proof on the issue of reliance (if it continues to exist as an element to be proven), are cloudy issues in this Circuit. Formerly, the proper inquiry on the issue of reliance had been to ask "whether the plaintiff would have been influenced to act differently than he did act if the defendant had disclosed to him the undisclosed fact." *List v. Fashion Park, Inc., supra,* 340 F.2d at 463. The rule enunciated in the *List* case, however, appears to have suffered some erosion of late. The result remains unclear.

This Court and the United States Court of Appeals for the Second Circuit have noted the recent decisions of the United States Supreme Court in *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970) and *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). The Court of Appeals, in commenting on these cases, noted that

"the Supreme Court held that, under the circumstances of those two cases, it was unnecessary to prove actual reliance. It was enough that there were material misrepresentations in solicitation [of] documents which were 'an essential link in the accomplishment of the transaction.' (citation omitted) The full implications of those decisions have not yet been determined. (citations omitted) We decline to hold on the present state of the law that it was plain error for the district court in the instant case not to have instructed the jury according to the *Mills* and *Ute* formulations." *Cohen v. Franchard Corporation,* 478 F.2d 115, 124 n.12 (2d Cir. 1973), *cert. denied,* 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 106, 42 U.S.L.W. 3197 (1973).

As the above-quoted passage seems to indicate, those holdings by the Supreme Court may be limited to the factual situations presented in each of those cases. This Court can only assume that reliance continues to be an element in 10b–5 cases.

Fortunately, the presence or absence of reliance as an element will not affect

the outcome of the instant case. However, for the sake of completeness this Court will briefly examine the evidence submitted on this issue.

This Court is not impressed with plaintiff's bare assertion that he would have acted differently. Plaintiff either had in his possession or had access to all of the material information known to defendant, yet he remained unmoved. Nor did plaintiff choose to follow up on the March 13, 1970 meeting in any manner. There is no basis for this Court to find that the March 1970 memorandum would have tipped the scales.

Defendant contends that plaintiff relied on the possibility of a public offering at approximately $7.00 per share. There is no need to address this allegation. It is sufficient to state that plaintiff has failed to show that he would have been influenced to act differently.

*Due Care*

The regulatory goal sought to be achieved by Congress in enacting these Sections was that material corporate information be equally accessible to all parties. Thus, an "insider" would not normally be allowed to recover against another "insider" since they would normally have equal access to information. The question, however, of who is an "insider" would not necessarily turn on the position or title which one holds. Rather, it would turn "on the basis of what a party knows or reasonably should know considering the information to which he has access." *Harnett v. Ryan Homes, Inc.,* 360 F.Supp. 878, 886 (W.D.Pa.1973). Therefore, the examination of due care must be concerned with whether plaintiff either had the knowledge, or if he did not, whether he exercised due care to obtain information to which he had access. The question of access necessarily includes the question of equality of access.

Plaintiff was an officer and director of Chelsea House. He maintains that in spite of this he was an "outsider" as he performed no managerial function and was not involved in the day-to-day affairs of Chelsea's management. He maintains that he not only had no access to the information in question, but also that an examination of the books and records of Chelsea House would not have revealed the material contents of the March 1970 memorandum. This Court is not convinced.

Plaintiff was an officer and director of Chelsea House and was also in charge of Chelsea's account at his law firm. In this latter capacity he did review the Chelsea registration statement and subsequently signed it as a director. He is bound by the knowledge contained therein. He has also held a stock interest in Chelsea House at one time.

Plaintiff was instrumental in introducing Chelsea House to several underwriters and from time to time participated, at least peripherally, in meetings between Chelsea and the underwriters. He also knew in each instance of the outcome of negotiations with various underwriters.

Plaintiff had made the initial contact with Price Waterhouse, and though he then retired from active participation in this relationship, he resurfaced after the fiscal year-end to urge Steinberg to have Price Waterhouse prepare up-dated financials. His access to this up-dated information, if any, was at least equal to defendant's.

Plaintiff states that he made repeated inquiries of Steinberg. These questions were at all times very brief and very general in nature. Steinberg's replies on all occasions were equally brief and general. Plaintiff maintains that he believed Steinberg's representations, and that there was no indication that further inquiry was needed. To the contrary, the New York Magazine article,[6] *inter alia,* made quite specific reference to Steinberg's reputation for making the truth "elusive". Also, Steinberg's representations were made in the face of the turnaround experienced from the results

**6.** This article, entitled "The Chelsea Boys and How They Grew", is defendant's Exhibit A.

of the first six months of fiscal 1969 (unaudited) to the results for the fiscal year ended October 31, 1969 (audited). This was a turnaround of approximately $150,000 of net earnings. Plaintiff testified that this turnaround did not alarm him. However, when you add the New York Magazine article and the financial problems to the complaints of the defendant, it is hard to imagine that plaintiff could persist in his reliance on Steinberg's advice, or even if he continued to rely, that he would not make more extensive inquiries. Plaintiff admittedly possessed a high degree of sophistication with regard to corporate matters as evidenced by his service as director on the boards of approximately ten companies.

The accounting procedures at Chelsea House were haphazard at best. Plaintiff maintains that the lack of interim financial statements and the imprecise accounting procedures would have made much information inaccessible to him. However, as the testimony of Mae Kessler, the bookkeeper at Chelsea House, indicated this information was equally inaccessible to both plaintiff and defendant. Indeed, she testified that she would not have afforded access to any of the books to either plaintiff or defendant without the approval of Steinberg and with his approval she would have granted all information and access to information to both parties on an equal basis.

Plaintiff alleges further that a conspiracy of silence existed at Chelsea House and that this would have prevented his gaining much material information regardless of his inquiries. Even assuming such a conspiracy existed, and there is no finding to that effect, defendant here was clearly no party to it. To the contrary, defendant was considered objectionable by those around him for his constant badgering about problems he perceived at Chelsea.

 Certain other factors deserve mention as they lend color to the picture and should have caused plaintiff to inquire further. The mere fact that the books and records of Chelsea House were in disarray should have ignited a spark of concern. Also, the existence of a personality conflict of the magnitude evidenced here between two major stockholders and officers of such a small, privately held corporation is, in itself, a warning. Lastly, plaintiff, in a sworn petition in support of his law firm's petition for legal fees in Chelsea's Chapter XI proceeding, stated that he (his firm) was "fully familiar" with the business of Chelsea House and its financial condition during the period prior to the filing of the petition. While no one of these factors, standing alone, would necessarily prompt plaintiff to make further inquiry, the sum total was more than sufficient to prompt plaintiff, in the exercise of due care, to inform himself further prior to his purchase of stock. He has failed in his duty to exercise due care.

### Count Two

Plaintiff alleges that defendant violated Section 12 of the Securities Act of 1933, 15 U.S.C. § 77*l*, by an omission to state material facts about the financial affairs of Chelsea House.

 On this issue, defendant has the burden of proving lack of scienter. *Hill York Corp. v. American International Franchises, Inc.*, 448 F.2d 680 (5th Cir. 1971). Defendant has sustained his burden of proof that he exercised reasonable care to avoid any omission of material fact which could have caused plaintiff to be misled.

### Counterclaim

 Having found defendant to be free from liability on the plaintiff's claims, this Court finds no reason to deny enforcement of the stock purchase agreement and promissory notes given to defendant by plaintiff.

Accordingly, this Court denies the relief requested by the plaintiff in count one and count two of the complaint and grants judgment to the defendant on the counterclaim in the amount of $33,852.00 plus interest at the rate of 9½% per annum as provided in the promissory note. In addition, costs and fees are granted to the defendant. The parties are to sub-

mit papers regarding the determination of costs and fees within ten days of the entry of this judgment.

So ordered.