The **CITY NATIONAL BANK OF FORT SMITH, ARKANSAS,** a National Banking Association, Appellee,

v.

**Ilo VANDERBOOM, DeHaan Livestock & Grain Farms, Inc.,** a South Dakota Corporation, **Andy D. DeHaan, Kenneth J. DeHaan** and **Lyle R. DeHaan, H. T. Ringling, James Nachtigal,** and **Robert Carter,** Appellants.

Nos. 19550–4.

United States Court of Appeals, Eighth Circuit.

Feb. 20, 1970.

Rehearing Denied March 20, 1970.

William M. Stocks, of Bethell, Stocks, Callaway & King, Fort Smith, Ark., on brief for appellants.

Don A. Smith, Fort Smith, Ark., for appellee; Thomas Harper, Fort Smith, Ark., on the brief.

Before MEHAFFY, GIBSON and HEANEY, Circuit Judges.

GIBSON, Circuit Judge.

The appellants, a group of investors from South Dakota, sought in the District Court to recover on individual counterclaims, hereinafter referred to as counterclaim, predicated on alleged fraudulent misrepresentations in the sale of corporate stock. The appellee's claims on bank loans were admitted. Appellants allege both common law fraud and fraud proscribed by Section 10(b) of the Securities Exchange Act of 1934 [1] and Rule 10b–5 of the Securities and Exchange Commission.[2] The Honorable John E. Miller, Senior Judge, rendered summary judgment against appellants in an extensive and scholarly opinion reported in 290 F.Supp. 592 (W.D. Ark.1968).

■■ In reviewing the trial court's grant of the bank's summary judgment motion our function is to determine whether a genuine issue of material fact exists and, if no such issue exists, whether on the substantive law the movant is entitled to judgment. Fed.R.Civ. P. 56. Where several possible inferences can be drawn from the facts contained in the affidavits, attached exhibits, pleadings, depositions, answers to interrogatories, and admissions on file, "[o]n summary judgment the inferences to be drawn from the underlying facts contained in such materials must be viewed in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). This court recognizes that summary judgment is an extreme remedy and that it should not be entered except where the movant is entitled to its allowance beyond all doubt. Traylor v. Black, Sivalls & Bryson, Inc., 189 F.2d 213, 216 (8th Cir. 1951). The basic test was articulated by the Supreme Court in Poller v. Columbia Broadcasting System, 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962):

"Summary judgment should be entered only when the pleadings, depositions, affidavits, and admissions filed in the case 'show that [except as to the amount of damages] there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' Rule 56(c), Fed.Rules Civ.Proc., [28 U.S.C.A.] This rule authorizes summary judgment 'only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is, * * * [and where] no genuine issue remains for trial * * * [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try.' Sartor v. Arkansas Natural Gas Corp., 321 U.S.

1. 48 Stat. 891 (1934), 15 U.S.C. § 78j(b) (1964):

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

* * * * *

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

2. 17 C.F.R. § 240.10b–5 (1969):

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security."

620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)."

The intricate factual situation of this case is set forth in Judge Miller's reported opinion and will not be repeated in full here. However, for purposes of convenience in discussing the issues it is necessary to summarize the background and the dispositive facts.

Maurice Markham and his brother-in-law Jimmy Willis entered the shell home business in Oklahoma in 1960 by forming Markham Homes, Inc. In 1965 Markham Homes was in need of shell home financing and Markham contacted Austin Gatlin of Mountainburg, Arkansas to assist him in this quest. Gatlin, who formerly owned a majority interest in Peoples Loan and Investment Company, an Arkansas corporation, advised setting up a similar financial institution in Arkansas. To secure the capital required to materialize this idea, Markham solicited the help of the defendants in this action, who were friends and acquaintances made by Markham during the years he practiced veterinary medicine in South Dakota (up to 1962). The South Dakota investors were persuaded and on August 10, 1965, in Mountainburg, Arkansas, they met with Gatlin, Markham and Willis and formed Investors Thrift Corporation (ITC), an Arkansas corporation. The South Dakota investors put up $150,000.00 at that time for which they were to be issued non-voting shares, with all of the voting stock to be held by Markham Homes.[3]

Thinking that it would be easier to purchase a financial institution than to start one, Gatlin presented a letter on August 10th from Sam Sexton, Jr., one of the owners of American Home Builders, Inc. (AHB), offering to sell AHB for $500,000.00. AHB owned all of the stock of three construction companies and held voting control (68%) of Peoples Loan and Investment (PL&I), ostensibly the type of financial institution Markham Homes and ITC were looking

for. Gatlin was quite familiar with PL&I as he had sold a majority of its voting stock to AHB, owned by Sexton, James Hall and Huey Smith, on July 1, 1964 for $500,000.00. To enable it to purchase the PL&I stock, AHB borrowed $700,000.00 from Texas Capital Corporation, with Sexton and Smith executing personal guarantees for the entire amount and Hall giving a personal guarantee for either $150,000.00 or $200,000.00.

An agreement for the sale of AHB dated September 2, 1965 was drawn up by Sexton with the sale price set at $200,000.00 plus assumption of the $700,000.00 loan from Texas Capital. ITC was unable to raise the funds in time to close on September 2, 1965 but after Markham made a trip to South Dakota where he successfully solicited funds from the ITC stockholders there, an option to buy contract was signed on September 9, 1965.

The option provided for payment of $150,000.00 to Sexton, Hall and Smith as a consideration for the option, which amount would also be applied on the purchase price if the option was exercised, and for forfeiture of that amount if the option was not exercised on or before January 10, 1966. Contingent upon the success of AHB, $100,000.00 of this payment was to be paid to Markham in the form of ITC stock as a commission for setting up the deal and was to be shared with Gatlin. The option contract also provided that Markham would take over immediately as general manager of AHB and that Gatlin would begin work on September 15th as a consultant to PL&I. If the investors chose to exercise the option, the contract required another payment of $157,500.00 to Sexton, Hall and Smith, payment of $300,000.00 to Texas Capital on or before January 10, 1966 and an additional payment of $400,000.00 to Texas Capital on or before June 30, 1966.

---

3. H. T. Ringling and Robert Carter each subscribed for 60,000 shares, Andy De-Haan for 150,000 shares and Ilo Vanderboom for 40,000 shares.

Investor Vanderboom traveled to Arkansas to visit and to examine the books of AHB and PL&I, but it appears that the South Dakota investors primarily relied on their agent Markham for an evaluation of AHB. Markham did check with officials of three Arkansas regulatory agencies (the State Bank Commissioner, the Securities Commissioner and the Insurance Commissioner), who informed him that PL&I was certified to operate and was conforming to all rules and regulations. Markham had CPA Jim Tuttle make a survey of AHB and PL&I and Tuttle advised him an audit of PL&I would take six months with available personnel and a minimum of three months no matter how many were employed.

After examining the financial statements of the South Dakota investors, Hall, who also was the vice-president of the City National Bank of Fort Smith, Arkansas, assured them that the bank would lend them some of the funds needed to carry out the purchase. So, on October 29, 1965, the South Dakota investors traveled to Fort Smith to obtain their loans from City National.

It is alleged that Hall had earlier represented to Markham that PL&I was worth at least a million dollars and that he made similar representations as to the financial soundness and profitability of both AHB and PL&I on October 29 to the South Dakota investors, in the presence of the president of City National, Ed Smoot. The affidavit of investor Andy DeHaan asserts that in answer to his question as to whether this was a good investment, Smoot advised him that it was. Smoot, however, denies the entire conversation and states that he knew only that the funds loaned would be invested in ITC, that he was totally unaware that the ultimate investment of the loan proceeds would be applied on the purchase of AHB. However, inasmuch as Hall's affidavit states that the bank officers did know of his interest in AHB and of his personal guarantee of the Texas Capital loan and Smoot himself acknowledged that Hall disqualified himself on the loan transaction because of his personal interest, it is fair to infer that Smoot was aware that ITC would use the funds to apply on the purchase of AHB.

On October 29, 1965, after approval by the bank's discount committee, Smoot represented the bank in making the following loans, secured by non-voting ITC stock and Markham's guarantee: (1) $15,000.00 to Vanderboom; (2) $90,-000.00 to DeHaan Livestock; (3) $10,-000.00 to Ringling; (4) $25,000.00 to Carter. Hall and Smoot were both on the 9-member discount committee which reviews all sizeable loans, as was Les Greathouse who along with Smoot handled the AHB and PL&I accounts. PL&I was the bank's largest depositor as it was obligated under Arkansas law to maintain a statutory cash reserve. Since PL&I occasionally would have to borrow from the bank to maintain the required cash reserve, it routinely filed monthly financial statements with the bank and furnished the bank the Arthur Andersen audit report of PL&I completed in October of 1965.

On November 5, 1965, ITC exercised the purchase option and $157,500.00 was paid Sexton, Hall and Smith and $400,-000.00 was paid Texas Capital.

On December 31, 1965, the South Dakota investors increased their loans with the bank as follows: (1) Vanderboom, from $15,000.00 to $25,000.00; (2) Ringling from $10,000.00 to $40,000.00; (3) DeHaan Livestock, from $90,000.00 to $105,000.00; (4) Carter, from $25,-000.00 to $40,000.00. On January 10, 1966, ITC paid the final $300,000.00 owed Texas Capital.

In early 1966 a depositors' run on PL&I occurred when it was discovered that Sexton had been jailed in Brazil. He was later released without any apparent consequences.

On February 25, 1966, James Nachtigal, another South Dakotan, borrowed $50,000.00 from the City National Bank and invested it in ITC.

On July 1, 1966, AHB hired Ronald Butler, a CPA, to determine the financial condition of AHB. Although Butler apparently worked full-time into 1967, it was not until October of 1967 and the completion of the Fred Landau & Company audit that the investors learned the true financial condition of AHB. The audit allegedly revealed that AHB had a consolidated net deficit of $537,253.18 on September 30, 1965 (i. e. during the time ITC was deciding whether to exercise the option or not) and that PL&I had an adjusted net worth of $31,152.41 on June 30, 1965.

Each of the South Dakota investors made payments of principal to the bank on June 5, 1967, and all but DeHaan Livestock executed agreements extending the maturity of the notes to September 5, 1967, purportedly pending the outcome of the Landau audit.

In early November of 1967 Ilo Vanderboom, DeHaan Livestock & Grain Farms, Inc., H. T. Ringling, James Nachtigal, Robert Carter, R. S. Miskimins, Richard Adamson, Wendell Foxley, William Nash, Ervin Ortman, Herbert Ortman, Stanley Weiland, Donald Nachtigal, James Klaudt and Markham Homes, Inc., brought suit in the state court of South Dakota "for rescission and/or damages" in connection with ITC's purchase of AHB against Sexton, Hall and Smith as the sellers, and against Gatlin and the City National Bank of Fort Smith, Arkansas, for aiding, abetting and conspiring with the sellers to defraud the investors and ITC (ITC, however, was not a party to this action).

On November 11, 1967 the bank filed complaints in the United States District Court for the Western District of Arkansas seeking judgments on various notes, naming Vanderboom, DeHaan Livestock, Ringling, James Nachtigal and Carter (all of whom were plaintiffs in the South Dakota suit) and Andy DeHaan, Kenneth DeHaan and Lyle DeHaan as parties defendant in the five separate civil suits.[4]

On December 5, 1967 the District Court granted a preliminary injunction enjoining the defendants from proceeding further against the bank in the suit pending in the South Dakota court and ordered the five cases filed by the bank consolidated.

On March 13, 1968 the defendants in the five consolidated cases admitted the bank's claim, but counterclaimed on the theory that the bank was a participant in the fraudulent misrepresentation allegedly made in connection with the sale of the AHB stock, and asked that the notes sued on by the bank be cancelled and that the defendants be awarded additional damages totaling $415,750.00 plus costs and attorney's fees.[5]

The preliminary injunction was made permanent on March 22, 1968, so on May 7, 1968 the defendants filed a third-party complaint seeking to join the following as parties defendant: Sexton, Hall, Smith, Gatlin, Gatlin's wife, Diamond G Ranch, Inc. (a Gatlin corporation) and Texas Capital Corporation (now TeleCom Corporation). When this third-party motion was overruled on July 10, 1968, the eight defendants, ITC, and all the other plaintiffs in the South Dakota suit except Markham Homes proceeded to file a separate civil action in the federal court on July 18th (hereinaf-

4. The defendants in the five suits broke down as follows:
  (1) Case No. 19550, Ilo Vanderboom;
  (2) Case No. 19551, DeHaan Livestock & Grain Farm, Inc., Andy DeHaan, Kenneth DeHaan and Lyle DeHaan;
  (3) Case No. 19552, H. T. Ringling;
  (4) Case No. 19553, James Nachtigal;
  (5) Case No. 19554, Robert Carter.
  The numbers assigned to these cases are their docket numbers on appeal to this court.

5. The $415,750.00 represents the amount of additional money advanced by the various defendants and breaks down as follows:
  (1) Vanderboom, $56,250.00;
  (2) DeHaan Livestock & Grain Farms, Inc., $103,000.00;
  (3) Ringling, $103,000.00;
  (4) Nachtigal, $50,500.00;
  (5) Carter, $103,000.00.

ter referred to as the companion case) against the bank, Sexton, Hall, Smith, Gatlin, Gatlin's wife, Diamond G. Ranch, Inc. and Texas Capital Corporation.

On August 6, 1968 the defendant investors' motion to consolidate the instant case with the companion case was overruled.[6] The court on October 2, 1968 granted the bank's motion for summary judgment, held the defendants liable on their promissory notes to the bank and dismissed the defendants' counterclaim against the bank. City National Bank v. Vanderboom, et al., 290 F.Supp. 592 (W.D.Ark.1968).

The District Court found that the evidence did not establish that the bank had knowledge of the alleged fraud perpetrated by one of its officers Hall and others upon the makers of these notes and any knowledge which Hall had concerning the alleged fraud cannot be imputed to the bank since it was in Hall's interest to conceal his knowledge. The Court also ruled that the alleged fraudulent scheme was not revealed to Ed Smoot, the president of the bank and the bank's representative in the making of the loans, and that therefore the bank acted in good faith in making the loans. From its finding that the bank did not sell or offer to sell any security of any kind to the investors but merely loaned them some of the money with which to buy capital stock in ITC, the Court concluded that the bank's behavior in making these loans did not fall within the statutory coverage of the "in connection with the purchase or sale of any security" clause of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5.

In addition, the Court held that knowledge obtained or which would have been obtained in exercise of reasonable diligence by the investors' agent Markham was imputable to the investors, and thus their giving of renewal notes and making partial payments over a year and a half after the loan transactions waived any fraud in the transactions and they as makers were estopped from pleading such defense in actions on renewal notes. The final ground for the District Court's holding was that the bank was a holder in due course, so even if Hall had made false statements or concealed facts relative to the sale of AHB to the investors, such fraud was not a defense to this action on the notes brought by the bank since only fraud as to the nature of the instrument itself is a defense to an action by a holder in due course.

## I. STANDING TO SUE UNDER RULE 10b–5.

Although Rule 10b–5 itself does not provide for a private cause of action, civil liability has been generally implied by the federal circuits.[7] However, there appears to be a serious question as to the availability of this 10b–5 counterclaim to the investors individually due to the "purchaser-seller" standing requirement imposed by the "in connection with the purchase or sale of any security" clause of both the statute and the rule. Although a private shareholder plaintiff seeking injunctive relief under Rule 10b–5 has been held to have standing even though he was not a purchaser or seller, Mutual Shares Corp. v. Genesco, Inc., 384 F.2d 540, 546–47 (2d Cir. 1967), we note that that same court dismissed an action for damages filed by a plaintiff who had not sold any of his shares but was holding them at a loss.

---

6. In the companion case on August 8, the court dismissed ITC's complaint for failure to state a claim against the bank and also granted the bank's motion for summary judgment against all the plaintiffs in the companion case, except R. S. Miskimins, whose complaint was abated until the disposition of a similar suit pending in the South Dakota courts.

7. Without enumerating the cases here, an analysis so concluding is noted in 6 L. Loss, Securities Regulation 3871 (1969). The cases cited by Loss merit the conclusion that "[t]he existence of a private cause of action [under Rule 10b–5] has now been recognized—whether by way of direct holding or *obiter* or *sub silentio* —by ten of the eleven Courts of Appeals." Cases are cited on pp. 3871–73.

In Greenstein v. Paul, 400 F.2d 580 (2d Cir. 1968), the Second Circuit held:

"It has long been the rule in this circuit that to maintain an action under § 10(b) of the Act and Rule 10b–5 of the Securities and Exchange Commission the plaintiff must have been a seller of the stock involved. Birnbaum v. Newport Steel Corp., 193 F. 2d 461 (C.A.2, 1952), cert. denied 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952). Although criticized, Entel v. Allen, 270 F.Supp. 60, 70 (S.D.N.Y., 1967), it is still the rule at least insofar as actions for damages are concerned. Mutual Shares Corp. v. Genesco, Inc." *Id.* at 581.

We are aware that strict application of this standing rule has worked hardships and that courts have fashioned mitigating doctrines granting standing to plaintiffs who are not technically purchasers or sellers of securities. *E. g.* Mader v. Armel, 402 F.2d 158, 160–161 (6th Cir. 1968), cert. denied, 394 U.S. 930, 89 S.Ct. 1188, 22 L.Ed.2d 459 (1969) (merger deemed a "sale"); Vine v. Beneficial Finance Co., 374 F.2d 627, 632–636 (2d Cir.), cert. denied, 389 U.S. 970, 88 S.Ct. 463, 19 L.Ed.2d 460 (1967) (forced or constructive sale due to merger); Commerce Reporting Co. v. Puretec, Inc., 290 F.Supp. 715, 718–719 (S.D. N.Y.1968) (person prevented from selling because of alleged fraud has standing to sue); *see generally* Comment, SEC Rule 10b–5—"In Connection With the Purchase or Sale of Any Security" Restriction: Need for Analytical Precision, 5 Colum.J.L. & Soc.Prob. 28, 42–45 (1969).

The investors argue that they should be deemed defrauded purchasers of AHB for the purposes of this counterclaim because ITC, the actual purchaser, was never an operating company and its corporate structure was a mere conduit which was convenient for the investors to use in making this purchase, and because the bank knew that the funds loaned to the investors were for the purpose of buying AHB.

The only authorities cited by the investors for their theory that for the purpose of determining standing to sue under Rule 10b–5 they should be deemed the purchasers of AHB are cases dealing with "piercing the corporate veil." Under this theory courts have disregarded the corporate entity when it was being used to defeat public convenience, justify wrong, protect fraud, or defend crime. Majestic Co. v. Orpheum Circuit, Inc., 21 F.2d 720 (8th Cir. 1927). Thus, in order to reach an equitable result courts have pierced the corporate veil and held stockholders personally liable for corporate obligations. This doctrine has no application in the instant case since ITC committed no fraud, rather ITC was the allegedly defrauded party. Also persuasive is the fact that the defendant investors do not comprise all of the shareholders of ITC. Furthermore, ITC was not a mere conduit formed by these investors to purchase AHB. ITC had its own separate corporate structure and only subsequent to its incorporation did Gatlin propose that ITC purchase another financial institution rather than starting one of its own. Under these circumstances we feel the corporate integrity of ITC must be respected and not glibly and casually disregarded.

Therefore, we conclude that the defendant investors do not satisfy the "purchaser-seller" standing requirement of Section 10(b) and Rule 10b–5. The proper course of action for these investors was for them to raise their 10b–5 claim by bringing a derivative suit on behalf of ITC. *E. g.*, Schoenbaum v. Firstbrook, 405 F.2d 215, 219 (2d Cir. 1968) (en banc), cert. denied, 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969). Had the investors brought a derivative suit on behalf of ITC, the "purchaser-seller" standing requirement would have been satisfied by ITC. The stockholder who brings a derivative suit need not personally be a purchaser or seller, it is sufficient that he allege the corporation purchased or sold shares in connection with some fraudulent activity. Surowitz v. Hilton Hotels Corp., 342 F.2d

596, 604 (7th Cir. 1965), rev'd on other grounds, 383 U.S. 363, 86 S.Ct. 845, 15 L.Ed.2d 807 (1966); Greater Iowa Corp. v. McLendon, 378 F.2d 783, 791 (8th Cir. 1967).

## II. STATUTORY COVERAGE OF SECTION 10(b).[8]

In addition to the investors' lack of standing to raise their 10b-5 counterclaim, we find that the alleged misrepresentations and nondisclosures on the part of the bank do not fall within the statutory coverage of the "in connection with the purchase or sale of any security" clause. The defendant investors allege that Smoot misrepresented the financial condition of AHB on October 29, 1965, and that he silently acquiesced to misrepresentations made by Hall on that date when he knew or had reason to know that such representations were untrue, because the bank had in its possession monthly financial reports from PL&I and an Arthur Andersen audit of PL&I completed sometime in October of 1965 and because Smoot was the bank official who oversaw the PL&I account.

It is apparent that the extent of the coverage and liability imposed under Section 10(b) of the Securities Exchange Act and Rule 10b-5 has not as yet been precisely defined. As noted by the Supreme Court in SEC v. National Securities, Inc., 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), the statutory section and the rule constitute one of several broad antifraud provisions set forth in the securities law in which application of the "allegedly proscribed conduct must have been 'in connection with the purchase or sale of any security.' The relevant definitional sections of the 1934 Act are for the most part unhelpful * * *. Consequently, we must ask whether respondents' alleged conduct is the type of fraudulent behavior which was meant to be forbidden by

the statute and the rule." *Id.* at 466–467, 89 S.Ct. at 572.

The Second Circuit recently considered the question of statutory coverage under Rule 10b-5 and fashioned a two-step test applicable to both private damage actions and suits for injunctive relief. In Heit v. Weitzen, 402 F.2d 909 (2d Cir. 1968), cert. denied, 395 U.S. 903, 89 S.Ct. 1740, 23 L.Ed.2d 217 (1969), a private damage action under 10b-5, the Court made clear that the first step of this statutory coverage test is governed by principles enunciated in SEC v. Texas Gulf Sulphur Co., 401 F. 2d 833 (2d Cir. 1968) (en banc), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), which "construed the 'in connection with' requirement broadly and held that the clause was satisfied whenever a device was employed 'of a sort that would cause reasonable investors to rely thereon, and, in connection therewith, so relying, cause them to purchase or sell a corporation's securities,' SEC v. Texas Gulf Sulphur Co., at 860." 402 F.2d at 913. If the plaintiff has met the requirements of this "in connection with" test, *Heit* states that the second step of the statutory coverage tests is "the question of the standard by which the conduct of the defendants is to be judged." *Id.* Although the Second Circuit held that proof of negligence was sufficient to sustain an action for injunctive relief under Rule 10b-5(2) in *Texas Gulf Sulphur, Heit* did not reach the question of whether negligence would likewise suffice in a private suit for damages.

Since we held in Myzel v. Fields, 386 F.2d 718, 734–735 (8th Cir. 1967), cert. denied, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968) that "[p]roof of 'scienter,' i.e., knowledge of the falseness of the impression produced by the statements or omissions made, is not required under Section 10(b)," we disagree with the second step of the Second

8. As defined by one commentator, statutory coverage means "the type of wrongdoing actionable under rule 10b-5." Comment, SEC. Rule 10b-5—"In Connection With the Purchase or Sale of Any Security" Restriction: Need for Analytical Precision, 5 Colum.J.L. & Soc.Prob. 28, 28 n. 4 (1969).

Circuit's test to the extent that it does not reflect recognition of a negligence standard but otherwise we are in accord with the standard formulated.[9]

■ We think this two-step test breaks down as follows: (1) With regard to misrepresentations, the question is whether a reasonable investor, in light of the facts existing at the time of the misrepresentation and in the exercise of due care, would have been entitled to rely upon the misrepresentation. With regard to nondisclosures, the issue becomes whether a reasonable investor, in light of the facts existing at the time of the nondisclosure and in the exercise of due care, would have been entitled to receive full disclosure from the party charged and would have acted differently had the alleged nondisclosure not occurred. (2) If the plaintiff satisfies this "in connection with" step, it then becomes necessary to determine whether the defendant's misrepresentation or nondisclosure was made with scienter or from a lack of due diligence.[10] *See Texas Gulf Sulphur Co.*, 401 F.2d at 863.

■ It should be noted from the outset that this "reasonable investor" test is an objective standard. Whether

9. We note that the 9th Circuit is the only other Court of Appeals which has squarely recognized a private cause of action under Rule 10b–5 for negligent misrepresentations. Ellis v. Carter, 291 F.2d 270 (9th Cir. 1961). Notwithstanding Judge Friendly's statements in his concurring opinion in *Texas Gulf Sulphur* that the standard by which the conduct of the defendants is to be judged should embody a scienter requirement in private damage suits, the following language from the majority opinion permits the inference that the Second Circuit may be on the verge of dropping the scienter requirement in private actions, too: "[A] review of other sections of the Act from which Rule 10b–5 seems to have been drawn suggests that the implementation of a standard of conduct that encompasses negligence as well as active fraud comports with the administrative and the legislative purposes underlying the Rule. * * * [T]his position is not * * * irreconcilable with previous language in this circuit, because 'some form of the traditional scienter requirement,' * * * sometimes defined as 'fraud,' * * * is preserved. This requirement, whether it be termed lack of diligence, constructive fraud, or unreasonable or negligent conduct, remains implicit in this standard, a standard that promotes the deterrence objective of the Rule." *Texas Gulf Sulphur Co.*, 401 F.2d at 855. Although Professor Loss indicates concern that "Clause (2) of the rule, which refers merely to material misstatements and half-truths without using fraud or *scienter* language of any kind," may be an impermissible implementation of a statutory provision that speaks in terms of "any manipulative or deceptive device or contrivance," he concludes that "[t]he common law development, reinforced by the general statutory purpose, might well justify extension of Clause (2) to something at least approaching simple negligence." 6 L. Loss, Securities Regulation 3885 (1969). *See generally* Comment, Negligent Misrepresentations Under Rule 10b–5, 32 U.Chi.L.Rev. 824 (1965).

10. One commentator who argues that a negligence standard based on the concept of access to information should obtain in 10b–5(2) private actions has suggested that reasonable reliance should be a condition to all private actions based on negligent misrepresentations under 10b–5.
"It is not the defendant's position as insider per se which imposes the duty on him, but rather the possession of material facts to which the other party has no access.
*  *  *  *  *
"Not only should the plaintiff have to prove that he relied on the defendant's statements, but he must convince the trier of fact that his reliance was reasonable under all the circumstances at the time. In this way recovery would be denied to those who, because of their 'business sophistication,' acumen, or ready access to the information involved, could reasonably be expected to exercise a higher degree of care and investigation in their dealings."
Comment, Negligent Misrepresentations Under Rule 10b–5, 32 U.Chi.L.Rev. 824, 841–42 (1965) (footnotes omitted).
We feel that step one of our test properly reflects these considerations as the objective standard of a reasonable investor exercising due care in light of all facts effectively imposes a duty of reasonable investigation, thereby limiting the class of investors who will be protected under 10b–5(2) to conscientious buyers and sellers in good faith.

an investor did in fact rely upon a misrepresentation is immaterial for the purpose of determining statutory coverage, though reliance is a predicate for recovery once coverage is established. In applying this test to the instant case, we find a reasonable investor would not have relied upon any representations made by Smoot and that the bank did not owe a duty of full disclosure to the investors.

The investors had access to all the books and records of AHB and PL&I during the four-month option period. The investors allege they have never seen the Arthur Andersen audit of PL&I, that it is as yet still undiscovered by them. Regardless of what this audit might show, the fact remains that the audit was made for PL&I—not the bank. The investors either had access to this audit report, which was ostensibly in AHB files, or they had the right to secure it from the auditors. Markham, the investors' agent, knew of the report, had access to it and could have produced it if desired. As this court stated in Myzel v. Fields, 386 F.2d at 736:

> "[T]here is no duty to disclose information to one who reasonably should already be aware of it. Nor is there the necessity for one insider to 'search out details' for another insider, in the same sense that such a duty might exist towards others less informed."

Further support for our conclusion is found in Kohler v. Kohler Co., 319 F.2d 634 (7th Cir. 1963), 7 A.L.R.3d 486, where the Seventh Circuit held that the failure of a director of the corporation to disclose material facts to the plaintiff will not lead to liability under 10b-5 where the plaintiff himself has the ability and opportunity to discover those facts easily. The Supreme Court has also had occasion to state this general principle:

> "When the means of knowledge are open and at hand or furnished to the purchaser or his agent and no effort is made to prevent the party from using them, * * * he will not be

heard to say that he has been deceived to his injury by the misrepresentations of the vendor." Shappirio v. Goldberg, 192 U.S. 232, 241–242, 24 S.Ct. 259, 48 L.Ed. 419 (1904).

Since the investors in the case at bar had ready access to the information involved, it is reasonable to expect them to exercise a higher degree of care than third parties who were not sellers and did not profit from the sale but who might have had some peripheral or general knowledge about the financial condition of AHB.

■ Finally, we think the trial court was correct in its conclusion that even if Hall, the bank's vice-president, did conceal material facts from the investors, neither his action nor any knowledge he possessed of the alleged fraudulent scheme can be imputed to the bank under Arkansas law. The general agency rule that knowledge acquired by an officer or agent of a corporation while acting in his official capacity or within the scope of his duties will be imputed to the corporation is applicable to banks. Hooten v. State, 119 Ark. 334, 178 S.W. 310, 312–313, L.R.A.1916C, 544 (1915). However, where it is in the officer's interest to conceal his knowledge, his knowledge will not be imputed to the bank unless he is the sole representative of the bank in the transaction. Little Red River Levee Dist. No. 2 v. Garrett, 154 Ark. 76, 242 S.W. 555, 557–558 (1922).

■ Hall's personal interest in AHB was disclosed both to the investors and the bank and he disqualified himself from the loan transaction. Nondisclosure or misrepresentation of the real financial condition of the two corporations by Hall cannot be imputed to the bank under the doctrine of respondeat superior since it was manifest to all that Hall, as seller, was not acting in an agency capacity for the bank. Furthermore, any knowledge of a fraudulent scheme which Hall may have had cannot be imputed to the bank because Hall's noninvolvement in the loan transaction precludes the

**232**

possibility that his knowledge could be imputed to the bank under the sole actor doctrine.

No reported case has extended Rule 10b–5's umbrella of protection over such a wide area as is attempted by the investors in this case, nor has a basis been demonstrated for disregarding the corporate integrity of ITC, which was organized by the investors and their agent Markham for the purpose of setting up a public financial institution to secure funds for Markham's enterprises and then later utilized as a corporate entity to purchase control of AHB and its related companies.

Since the defendant investors are not entitled to recoup against the bank for their unfortunate investments with Markham and ITC under the more liberal and broader coverage of Rule 10b–5, it is clear that they have not shown any basis for a common law fraud action under Arkansas law against the plaintiff bank.

Judgment affirmed.