Thomas **BRANHAM**, Plaintiff,

v.

**MATERIAL SYSTEMS CORPORATION and Alan R. Novak**, Defendants, and Third-Party Plaintiffs,

v.

**Robert O. FIGUEREDO and Insco, S. A.**, Third-Party Defendants.

No. 71–1640–Civ.

United States District Court, S. D. Florida, Miami Division.

Jan. 31, 1973.

---

Fleming, O'Bryan & Fleming, Fort Lauderdale, Fla. (John S. Neely, Jr., Fort Lauderdale, Fla., of counsel), for plaintiff.

Cassel & Benjamin, Miami, Fla. (Julian R. Benjamin, Miami, Fla., of counsel) and Stroock & Stroock & Lavan, New York City (Gary J. Greenberg, New York City, of counsel), for defendants and third-party plaintiffs.

Vandroff & Mandell, Miami, Fla. (Richard J. Mandell, Miami, Fla., of counsel), for third-party defendants.

## MEMORANDUM OF FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER

JAMES LAWRENCE KING, District Judge.

By his complaint, plaintiff Thomas Branham charges defendants Material Systems Corporation ("MSC") and the chairman of its board of directors, Alan R. Novak, with fraud in violation of Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder by the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5, and the common law of the State of Florida in connection with an alleged purchase of MSC stock in March 1971. After the court denied a motion to dismiss, defendants answered denying liability, and, within the time allowed by Rule 14(a), commenced a third-party action against Robert O. Figueredo and Insco, S.A. ("Insco"), a Panamanian corporation, seeking indemnification and contribution in the event plaintiff should prevail in the action-in-chief. Third-party defendants answered denying liability and interposed a counterclaim against defendants. After discovery, defendants filed a motion for summary judgment which the court denied. The matter then came on for trial between January 15–17, 1973, before the court sitting without a jury. This memorandum constitutes the court's findings of fact and conclusions of law under Rule 52(a).

The basic facts giving rise to plaintiff's claim of fraud are undisputed. On August 18, 1970, MSC entered into a contract with Figueredo which provided that he or a South American corporation to be formed by him and/or "a limited group" of "close associates" would purchase 38,461 shares of MSC common stock for $250,000, or $6.50 per share, by no later than September 7, 1970. Thereafter, Figueredo and his corporation or group had the option of purchasing an additional 236,539 shares of MSC common stock in three installments between September 30 and November 30, 1970 at prices ranging from $7.25 per share to $5.52 per share. Full performance by Figueredo of all options would also have resulted in acquisition of a long-term, exclusive license to produce and sell MSC's composite materials building system and related components throughout Latin America and the Spanish-speaking areas of the Caribbean. Sometime prior to September 7, 1970, MSC received $100,000 under the contract from Figueredo's group, but no additional payments were made and MSC did not issue any of its stock to Figueredo or any member of his group.

Beginning sometime in either December 1970 or January 1971, Figueredo had a series of discussions with plaintiff, a personal acquaintance and former business colleague in Gramco International, S.A. ("Gramco"), concerning, among other things, the purchase by Branham of MSC's stock. Branham vis-

ited the MSC plant in California in early February 1971, and, thereafter, between February 24 and March 3, he and Figueredo entered into a series of five letter agreements which provided, in pertinent part, that Figueredo would seek to purchase from MSC on behalf of Branham 13,000 shares of MSC common stock for an aggregate price of $113,880, or $8.76 per share, payable to Insco. On March 4, 1971, Branham paid Figueredo $113,880; the latter thereafter wired only $84,500 to MSC's bank in California. Figueredo had written to Alan Novak on February 26, 1971, indicating that $84,500 would be forthcoming and that 13,000 shares of stock should be issued in the name of Thomas Branham. That letter, as modified by a subsequent undated letter, stated that in the event the request to issue shares was not accepted MSC was to return the funds to Figueredo's account at the First National Bank of Miami, the same account from which the money was provided.

On March 26, 1971, the MSC board of directors met and voted to reject Figueredo's request that 13,000 shares be issued to plaintiff. On or about April 20, 1971, the full $84,500 was returned by MSC to Figueredo's bank account. On or about April 26, 1971, Figueredo returned only $78,840 to Branham; $35,040—the difference between the $113,880 Figueredo received and the $78,840 he returned—was not repaid to Branham by Figueredo and constitutes the alleged damages suffered by plaintiff.

Plaintiff's complaint charges defendants both with active fraud and with aiding and abetting Figueredo in the commission of a fraud in connection with the alleged March 4 "purchase" of MSC's securities. As required under Rule 9(b), the complaint alleges that Figueredo and defendants defrauded plaintiff by making the following material misrepresentations:

"6. . . . Defendants and FIGUEREDO represented to Plaintiff that MSC would sell shares of MSC common stock to FIGUEREDO or to such persons as FIGUEREDO might designate at the same price FIGUEREDO would pay.

\* \* \* \* \* \*

8. . . . FIGUEREDO represented to Plaintiff that MSC required that FIGUEREDO or his designees pay $8.76 per share.

9. On information and belief, Defendants never told FIGUEREDO that he or his designees had to pay $8.76 per share, and in fact had led FIGUEREDO to believe that he or his designees had to pay only $6.50 per share.

10. . . . Defendants, negligently, recklessly or deliberately, represented to Plaintiff, expressly or by reasonable implication from their course of conduct, that FIGUEREDO or his designees had to pay $8.76 per share and omitted to state to Plaintiff that FIGUEREDO or his designees had to pay only $6.50 per share."

Figueredo is alleged to have acted as MSC's agent in the transaction at issue, and plaintiff asks the court to hold defendants responsible for any unlawful acts which Figueredo may have committed.

The complaint further alleges that sometime after March 4, but prior to the March 26 board meeting, Novak was informed by plaintiff that he had tendered Figueredo $113,880 rather than the $84,500 MSC had received. Plaintiff alleges that Novak told him that Figueredo or Insco had $100,000 on deposit with MSC and that, if MSC did not sell any shares of its stock to plaintiff, MSC would refund Branham's money by returning the $84,500 and paying plaintiff $29,380 out of the $100,000 fund. Plaintiff claims that he relied on this representation, as well as on the alleged representation concerning the price per share Figueredo had to pay, and as a consequence was damaged when Figueredo returned only $78,840 and converted the balance, $35,040, to his own use.

During the course of the three-day trial, all of the principals testified—

Messrs. Branham, Figueredo and Novak, as well as Michael Umansky, counsel to MSC. The court therefore had the opportunity to hear and observe each of said witnesses and to evaluate their credibility in the context of an adversary trial proceeding. The court has also read the 42 documentary exhibits and those portions of the depositions introduced into evidence.

The court finds that the August 18, 1970 contract between Figueredo and MSC was breached by Figueredo on or about September 7, 1970, when he failed to tender the full $250,000 due under the contract. Defendants so informed Figueredo and the only known member of his group, Ramon Piementel Hardy ("Piementel"). When a Venezuelan investment counselor wrote to Novak on October 30, 1970 inquiring about the relationship between Figueredo, Material Systems Corporation, N.V. (a company Figueredo was seeking to promote in Venezuela) and MSC, Novak responded by stating that Figueredo had failed to fulfill his obligations under the August 18 contract and therefore "neither he nor any company he may have promoted, has any license from us or other rights with respect to our company."

■■ Figueredo was not authorized to act on behalf of MSC as its agent in the sale of MSC stock. There is no evidence in the record to support a finding that defendants, by their conduct or words, held Figueredo out to plaintiff as their agent.[1] *See generally* Restatement 2d, Agency §§ 27, 125, 126. Plaintiff even testified that he was aware of the fact that Figueredo was in breach of the August 18 agreement prior to his contracting with Figueredo for the purchase of MSC shares. As plaintiff well knew, Figueredo was, in all of his dealings with Branham, acting solely on behalf of himself and/or Insco.

■ To prevail, plaintiff must therefore have proved by a preponderance of the credible evidence that defendants either made material misrepresentations directly to him or, being duty bound to disclose material information to him, remained silent. *See* Cochran v. Channing Corp., 211 F.Supp. 239, 243 (S.D.N.Y. 1962); Barnett v. Anaconda Co., 238 F. Supp. 766, 775 (S.D.N.Y.1965); West v. Zurhorst, 280 F.Supp. 574, 580 (S.D.N.Y.1967). The court concludes that plaintiff failed to meet this burden.

The court finds that the only contact between plaintiff and defendants or their representatives, specifically including Michael Umansky, prior to March 26, 1971 was Branham's visit to the MSC plant in California and, at most, two telephone calls during which Branham discussed the general business and financial position of MSC with Umansky and possibly Novak. The visit to the California facility was inconsequential in view of the fact that MSC was at that time pursuing a policy of encouraging visitors to view its first prototype home built of composite materials. Indeed, Novak testified that over 5,000 persons had visited the California facility. In addition, Branham testified that no false representations were made and no material information was withheld at that time. The telephone conversations constituted no more than introductory, general discussions with an individual identified as a Figueredo associate.

■ In these circumstances, there was no relationship subsisting between plaintiff and defendants which imposed upon the latter a duty of full disclosure to the former. As far as defendants were concerned, Branham was a stranger—an individual whose dealings were with Figueredo and whose investment intentions were known only to Figueredo. To impose the statutory duty of full

---

[1]. Plaintiff did testify that Novak told him prior to March 4 that he could "rely" on Figueredo. Novak denied that such a conversation ever took place. As indicated *infra*, the court specifically finds that Novak had no such conversation with Branham. Furthermore, in the absence of an appropriate predicate, the statement "you can rely on Figueredo" is insufficient to clothe Figueredo with the mantle of agency, either directly or via an equitable estoppel.

disclosure upon defendants on the basis of the minimal, nonsubstantive contacts here demonstrated would have the effect of unduly hampering and restricting the necessary and salubrious pursuit of equity investment by all privately held corporations.[2]

While the federal securities statutes have substituted a full disclosure approach for that of *caveat emptor*, SEC v. Capital Gains Research Bureau, 375 U.S. 180, 186, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963); Affiliated Ute Citizens v. United States, 406 U.S. 128, 151, 92 S. Ct. 1456, 31 L.Ed.2d 741 (1972); Herpich v. Wallace, *supra*, 430 F.2d at 801, they do not impose an absolute liability standard. Full disclosure is only required where the law imposes a duty to speak, and that duty exists only in circumstances which indicate an investment or fiduciary relationship between the seller and buyer, or knowledge, actual or implied, on the part of the seller that unless he speaks the buyer may act to his detriment. *See* Cochran v. Channing Corp., *supra;* Rothschild v. Teledyne, Inc., 328 F.Supp. 1054, 1056 (N.D.Ill. 1971); Affiliated Ute Citizens v. United States, *supra*, 406 U.S. at 153, 92 S.Ct. 1456, 31 L.Ed.2d 741. Here, there was no relationship between defendants and plaintiff, and defendants had no knowledge, actual or implied, concerning the nature of the Branham-Figueredo negotiations and contracts.

Branham testified that he informed both Novak and Umansky prior to tendering the $113,880 to Figueredo on March 4, and again between March 4 and the MSC board meeting on March 26, that he had paid $113,880 to Figueredo, or $8.76 per share, for 13,000 shares of MSC stock. He stated that prior to March 4 he specifically asked Novak and Umansky to confirm the $8.-76 price as opposed to the $6.50 price stipulated in the August 18 contract, and that thereafter he sought confirmation from them of the receipt of $113,880. Plaintiff stated that prior to March 4 he received the assurances he sought from Novak and Umansky concerning the $8.76 price, and, thereafter, while he was told that only $84,500 had been received, he was assured that the full $113,880 would be returned if the shares were not issued by dipping into the $100,000 sum Figueredo had deposited with MSC. Novak and Umansky denied that such conversations took place. They both testified that they had no contact with Branham concerning any of the details of the tender of $84,500 for 13,000 shares until after the board's March 26 rejection of the offer. They testified that, save for what information was provided by Figueredo's instruction letters, they had no knowledge concerning what Figueredo was charging Branham, how much Branham had tendered to Figueredo, the nature of the contractual arrangements between Branham and Figueredo, nor, indeed, who supplied the $84,500. They both testified that not until sometime after March 26, when they spoke with both Branham and Figueredo to inform them of the board's

2. While the protection of investors is of primary importance under the federal securities statutes, it must be kept in mind, as the Fifth Circuit recently cautioned in Herpich v. Wallace, 430 F. 2d 792, 804–805 (1970),

"... that the nation's welfare depends upon the maintenance of a viable, vigorous business community. Considered alone, the sweeping language of Rule 10b–5 creates an almost completely undefined liability. All that the rule requires for its violation is that someone 'do something bad,' Jennings & Marsh, Securities Regulation 961 (2d ed. 1968), in connection with a purchase or sale of securities. Without further delineation, civil liability is formless, and the area of proscribed activity could become so great that the beneficial aspects of the rule would not warrant the proscription. See Ruder, Pitfalls in the Development of a Federal Law of Corporations by Implication Through Rule 10b–5, 59 Nw.U.L.Rev. 185, 207–208 (1964). In recognition of this problem, courts have sought to construct workable limits to liability under section 10(b) and Rule 10b–5 which will accommodate the interests of investors, the business community and the public generally. ..."

action, were they told any of the specifics of the Branham-Figueredo transactions.

■ Plaintiff's testimony concerning these matters was not consistent, was somewhat at variance from his testimony given on a pre-trial deposition, and was contradicted by certain documentary exhibits and the reasonable inferences to be drawn therefrom. On the other hand, the court was impressed with the honesty, forthrightness and candor of Alan Novak and Michael Umansky. Their testimony was consistent and was supported by the documentary exhibits. The court finds that they testified truthfully. Consequently, the court finds that neither Novak nor Umansky had any conversations with Branham on the subjects of the price per share, the aggregate amount received by Figueredo, the amount received by MSC, the nature of the contractual arrangements between Branham and Figueredo, or the $100,000 fund prior to the March 26 board meeting. The court finds that defendants were first informed of some of the facts concerning these matters in early April when Novak and Umansky spoke with Branham and Figueredo about the board's decision. Indeed, it was not until some time after May 3, 1971, when Branham wrote Umansky enclosing copies of the letter agreements executed between himself and Figueredo, that defendants were apprised of the full details of the Branham-Figueredo relationship. Until that time defendants had not seen or even been aware of the existence of those contracts. It is the court's conclusion, therefore, that defendants neither made direct misrepresentations to plaintiff, nor deceived him by failing to disclose material information which they were duty bound to reveal.[3]

■■ Under the law, plaintiff must prove not only a false representation or omission of information, but that that which was misrepresented or withheld was material—i. e., that had plaintiff known the truth he would not have acted in the fashion he did. As explained by the Second Circuit, the basic test of "materiality" is "whether 'a reasonable man would attach importance [to the fact misrepresented] in determining his choice of action in the transaction in question.'" List v. Fashion Park, Inc., 340 F.2d 457, 462, cert. denied sub nom. List v. Lerner, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965). *Accord,* Affiliated Ute Citizens v. United States, *supra,* 406 U.S. at 153–154, 92 S.Ct. 1456, 31 L.Ed.2d 741; Lehigh Valley Trust Co. v. Central National Bank, 409 F.2d 989, 993 (5th Cir. 1969); Mitchell v. Texas Gulf Sulphur Co., 446 F.2d 90, 97 (10th Cir. 1971), cert. denied, 404 U.S. 1004, 92 S.Ct. 564, 30 L.Ed.2d 558 (1971) and sub nom. Reynolds v. Texas Gulf Sulphur Co., 405 U.S. 918, 92 S.Ct. 943, 30 L.Ed.2d 788 (1972). The court must determine "whether the plaintiff would have been influenced to act differently than he did act if the defendant[s] had disclosed to him the undisclosed fact." List v. Fashion Park, Inc., *supra,* 340 F.2d at 463.

■ In this regard too, plaintiff failed to sustain his burden of proof. The documentary exhibits, particularly Plaintiff's Exhibit 14, indicate that in the event MSC turned down the request to purchase 13,000 shares, Figueredo could retain the full $113,880 so long as he provided Branham with 13,000 shares

---

3. Plaintiff's contentions, first raised at the trial, that he was also misled by the defendants' failure to disclose that a private placement of $1.5 million worth of MSC stock at $4.25 per share had been agreed to on February 25, 1971 and that the MSC shares he would receive would be restricted in no way helps his case. For one, the court has concluded that defendants owed plaintiff no duty of disclosure.

Secondly, Plaintiff's Exhibit 23, an investment letter which Figueredo had Branham sign and then sent to MSC, affirmatively states both that Branham was aware that MSC was selling its shares for materially less than what Branham was going to pay and that the shares sought to be purchased would be restricted.

of MSC's stock from his own "account" with MSC. The court finds that Branham was aware that Figueredo was paying only $6.50 per share, that Branham knew others were paying less than $6.50, that Branham was willing to pay $8.76 per share based on his own investment judgment as to the worth of MSC—which judgment was based on full information untainted by any fraudulent misrepresentation or omission—and that Branham's only objection to the difference between the $6.50 and $8.76 prices concerned the question of Figueredo's "morality". (Branham Deposition p. 92.) As such, even assuming the truth of Branham's allegations of deception, the court concludes that the price differential was not a material fact that if fully disclosed would have influenced Branham to have acted differently. *See* List v. Fashion Park, Inc., *supra,* 340 F.2d at 464.

A further prerequisite to recovery by plaintiff is that he prove that his damage was caused by his reliance on the alleged deception. The test of reliance is whether the alleged deception was a substantial factor in determining the course of conduct which resulted in plaintiff's loss. The reason for this requirement "is to certify that the conduct of the defendant actually caused the plaintiff's injury." List v. Fashion Park, Inc. *supra,* 340 F.2d at 462. See Johns Hopkins University v. Hutton, 326 F.Supp. 250, 258–259 and n. 11 (D.Md. 1971).

Defendants raised, as an affirmative defense, the contention that plaintiff failed to act with the due diligence to have been expected of a reasonable purchaser buying under the circumstances here present. See Clement A. Evans & Co. v. McAlpine, 434 F.2d 100 (5th Cir. 1970), cert. denied sub nom. Clement A. Evans & Co. v. A. M. Kidder & Co., 402 U.S. 988, 91 S.Ct. 1660, 29 L.Ed.2d 153 (1971); City National Bank v. Vanderboom, 422 F.2d 221, 230–231 (8th Cir.), cert. denied, 399 U.S. 905, 90 S.Ct. 2196, 26 L.Ed.2d 560 (1970). Defendants contend that, as a consequence, plaintiff's damages cannot be said to have been caused by defendants' conduct.

The requirement that an investor act reasonably and exercise due care in light of all of the facts available to him " 'imposes a duty of reasonable investigation, thereby limiting the class of investors who will be protected under 10b–5(2) to concientious buyers and sellers in good faith.' " Clement A. Evans & Co. v. McAlpine, *supra,* 434 F.2d at 104, quoting with approval City National Bank v. Vanderboom, *supra,* 422 F.2d at 230 n. 10. See also Mitchell v. Texas Gulf Sulphur Co., *supra,* 446 F.2d at 103; Kohler v. Kohler Co., 319 F.2d 634, 641–642 (7th Cir. 1963); Carlisle v. LTV Electrosystems, Inc., 54 F.R.D. 237, 239 (N.D.Tex.1972). The court concludes that plaintiff has not met his burden of proof as to causation because his reliance was unreasonable in that he failed to make a careful and diligent effort to inquire into and discover the true facts concerning the alleged fraud.

Plaintiff knew that the August 18 contract between MSC and Figueredo had been breached, yet he dealt exclusively with Figueredo, making no effort to inquire into the facts concerning MSC's relationship with Figueredo. Although the August 18 contract stipulated that Figueredo and his group would only be paying $6.50 per share for the initial acquisition of 38,461 shares, and although a February 26 contract between Figueredo and Branham (Plaintiff's Exhibit 14) confirmed to plaintiff the fact that Figueredo was only paying $6.50 per share, Branham never consulted with Novak or Umansky on the discrepancy between $8.76 and $6.50. Although Branham's objective was to purchase shares of MSC, and although he was aware of the fact that Figueredo and Insco were in financial trouble because of the collapse of Gramco, he nonetheless provided Figueredo rather than MSC with the $113,880 and never sought, through either the banks or Novak or Umansky, to confirm the amount forwarded to MSC. Although Branham saw the instruction letters sent to MSC

and noticed the absence of any statement concerning the price per share or the aggregate amount to be sent to MSC, he neither took steps to require Figueredo to confirm that he was sending the full $113,880 nor asked Novak or Umansky to confirm the amount MSC had received. Although he entered into five different contracts with Figueredo, signed an investment letter, visited the MSC plant in California and was about to make the largest single investment of his life, plaintiff, who is not an inexperienced investor, did not consult with an investment adviser, an attorney or with any representative of MSC. Although Branham was aware of the fact that MSC's board might turn down the request to purchase 13,000 shares, he took no steps to insure that Figueredo would return the full amount tendered or would provide 13,000 shares of MSC's stock from his own "account". Although Branham agreed to allow Figueredo to keep the full $113,880 in return for giving him 13,000 MSC shares from his (Figueredo's) own account, Branham never checked with MSC to ascertain if Figueredo had such an account. (Had Branham done so he would have learned that such was not the case.)

In the end, plaintiff's loss was the result of Figueredo's breach of his promise to return either the full $113,880 or 13,000 of his own MSC shares (which he never had) in the event that the MSC board turned down the proposal to issue 13,000 shares directly to Branham. MSC returned the full $84,500 it had received pursuant to the terms of the instruction letters. Defendants' conduct was proper and reasonable in every respect. Plaintiff's conduct was anything but reasonable and diligent under the circumstances of this case, and his loss can only be attributed to his own failure to exercise due care.

Defendants advance the contention that plaintiff has failed to establish his standing under §§ 17(a) and 10(b) as a purchaser of securities. *See* Herpich v. Wallace, *supra,* 430 F.2d at 806; Rekant v. Desser, 425 F.2d 872, 877 (5th Cir. 1970). There was, of course, no consummated purchase, but rather a tender of funds and a request that the money be accepted and 13,000 shares be issued to plaintiff. Defendants contend that plaintiff does not have standing as an "aborted purchaser" because there was no subsisting contractual relationship between plaintiff and defendants, made either directly or through the agency of Figueredo, under which Branham sought to effect a purchase which defendants deterred and deflected by their fraud. *See* Mount Clemens Industries, Inc. v. Bell, 464 F.2d 339, 345–346 and n. 11 (9th Cir. 1972); Commerce Reporting Corp. v. Puretec, Inc., 290 F.Supp. 715, 718–719 (S.D.N.Y.1968). While there is much to be said in support of defendants' position, since the court's findings and conclusions preclude plaintiff from recovering a judgment, it is not necessary that this issue be resolved in this case.[4]

Since defendants have prevailed in the main action, their third-party claim for indemnification and contribution is moot. The court must, however, decide third-party defendants' counterclaim against defendants.

It became clear, during June 1971, that the $100,000 initially tendered by Figueredo was put up entirely by Piementel, one of Figueredo's Venezuelan associates. Piementel rejected MSC's offer to issue shares for the money and sought return of the funds. Figueredo never disputed Piementel's claim and, on June 25, 1971, he gave MSC a written, notarized instrument releasing any claim he had to the $100,000. Thereafter Pie-

---

4. For the same reason, the court finds it unnecessary to pass upon the defendants' contentions that Branham and Figueredo had agreed to a settlement of this matter, first on or about April 19, 1971, and thereafter on June 25, 1971, and that plaintiff's damages were fully satisfied and compromised on June 25, 1971, when Figueredo assigned his entire right, title and interest to 113,000 shares of Gramco common stock to Branham and Piementel.

mentel and MSC settled the matter on the basis of MSC paying Piementel $95,000. The court concludes that Figueredo's claim to the $5,000 difference between what MSC got in September 1970 and what it returned to Piementel, plus $7,000 interest arising out of MSC's retention of the $100,000 for about one year, is, on the foregoing facts, wholly without merit.